(No. 30995.—

Outboard, Marine & Manufacturing Company, Johnson Motors Division, Appellant, *vs.* Robert L. Gordon, Director of Labor, *et al.*, Appellees.

*Opinion filed May 19, 1949—Rehearing denied September 19, 1949.*

CHARLES R. SPROWL, JOHN M. GROSS, and E. MARVIN BUEHLER, all of Chicago, for appellant.

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and JAMES C. MURRAY, all of Chicago, of counsel,) for appellee the Director of Labor; RICHARD S. FINN, and FRANK M. DALY, both of Waukegan, for other appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

This is an appeal from an order of the circuit court of Lake County, confirming an order of the Director of Labor allowing unemployment compensation to the office employees of appellant for the period from June 3, 1947, to July 10, 1947, during which its factory employees were out on strike. Appellant is Outboard, Marine & Manufacturing Company, Johnson Motors Division, and its plant is located in Waukegan, where over 1300 persons were employed in 1947. Appellees are approximately 120 office workers of this company. The claims of the employees involved were first heard by a deputy examiner for the Department of Labor, and he denied the relief. The claimants appealed to the director, and a duly authorized repre-

sentative appointed by him conducted a hearing. His recommendation allowing the claims was later approved by the director.

From the evidence taken by the department representative, it appears that the factory employees were members of a union known as Independent Marine and Machinists' Union and the office employees belonged to an organization called Local No. 1 Independent Marine and Machinists' Union. In November, 1946, each union entered into a separate working agreement with the appellant relative to hours and wages. Each agreement had a duration of two years and contained reopening provisions for discussion and renegotiation of both wages and hours during the contract period. At the same time there was an affiliation agreement in effect between the factory union and office union, executed in October, 1945. Among other things, it provided that Local No. 1 should not enter into wage and hour agreements with the company without the approval of the factory union; gave the latter the right to adjust any grievance of Local No. 1 with the company if the office workers and the company could not come to an understanding; and required meetings between the two unions at least every three months to discuss mutual policies. The factory employees' union had a full complement of officers but the office employees' local had no provisions in its bylaws for a president and started its official roster with a vice president. The agreement further provided that Local No. 1 should contribute one fourth of its dues to the factory union, payable quarterly.

In May, 1947, both unions reopened negotiations with appellant looking to increased wages. Parallel discussions were carried on by both unions, the president and chairman of the committee of the factory union handling the plant employees' negotiations without any assistance from the office union officers, but in the talks with the company as to the office employees' amendatory contract the same two

men took a leading part. On May 29, 1947, Local No. 1 made and entered into a satisfactory amendatory agreement with the company. The plant employees, being unable to agree with the appellant as to their differences, advised the company officials that a strike would start on June 3, 1947, at 7 A.M. On June 2 the personnel manager of the company arranged for a meeting of factory officials with the factory union officers in the company offices. This meeting was attended by several officials of each organization; however, no officers or members of Local No. 1 were invited to attend or were present. There is some dispute in the evidence as to all that transpired or was said at the meeting, but, as a result of the conversations held, the union officers agreed to issue passes to fifteen maintenance men and five officers of the company to enter the plant during the strike. None of the office workers nor their supervisors were to be given passes. At the meeting the union officers said the office employees would not be allowed to enter the plant; that there would be a picket line; and that "we are going to shut you down completely."

In support of their claim for unemployment compensation it is the contention of appellee-claimants herein that although the factory employees are prevented by section 7(d) of the Unemployment Compensation Act (Ill. Rev. Stat. 1947, chap. 48, par. 223,) from receiving benefits under that act, because they were on strike, the office employees are not so barred for the reason that their situation, as shown by the facts adduced before the department representative at the hearing, was such that they come within the exception specifically set forth in said subsection, which proviso reads as follows: "* * * provided, that this subsection shall not apply if it is shown that (1) He is not participating in or financing, or directly interested in the labor dispute which caused the stoppage of work, and (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the

stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * *."

Claimants contend that they did not participate in or finance the strike of the factory employees and were not directly interested therein, and that they did not belong to the same grade or class of workers as were so participating. They urge in support of such claim that they did not benefit as a result of the labor dispute, since all of their grievances had been settled prior thereto; that at no time during the strike did they attend any meeting of the strikers, and that they were never consulted or advised by the other union as to the progress of negotiations during the strike, receiving all their information in that regard from the newspapers. They further aver that no meeting of the members of the office employees' union was held during their unemployment; that they were told by the officers of the plant union that they would cross the picket line at their own risk; that they were not issued passes by the union following the agreement between the company and strikers as to what persons should be allowed to enter the premises; and that inasmuch as the office supervisors were not let in during the strike there was therefore no work for the office employees to do. They further point out that although a temporary business office was installed in a downtown hotel, they were not asked to come to work there or at the plant office; and that even if they had tried to go to work and had crossed or attempted to cross the picket line in effect during the strike, they could not have entered the plant because the gates thereto were kept locked at all times and instructions had been given to the gatekeepers, with the consent and acquiescence of appellant's officers, to allow no one to enter without a pass signed by the plant union officers.

The Director of Labor having held with the claimants, it is argued by the appellees, in advancing their aforesaid

contentions, that this court must accord due consideration to the findings and judgment of such administrative agent appointed by law, and that the findings of fact should not be disturbed unless manifestly against the weight of the evidence. This court has held in its consideration of findings of fact by an administrative agency, that it will not disturb the findings unless they are manifestly against the weight of the evidence or unless there is no substantial evidence to support them. (*Drezner* v. *Civil Service Com.*, 398 Ill. 219.) It is not within the province of this court to substitute its judgment for that of an agency such as herein appealed from, unless we can say that the findings of the agency are clearly and manifestly against the weight of the evidence. (*Liberty Foundries Co.* v. *Industrial Com.*, 373 Ill. 146.) An examination of the evidence and documents introduced at the hearing before the department representative must be made to ascertain if there is sufficient evidence in this case to support the findings of the director.

Karl Daydif, the first witness for claimants, testified that he was president of the plant union and not a member of Local No. 1, and that he acted in but an advisory capacity as to affairs of the latter local, his only acts, so far as their affairs were concerned, being in assisting the members of that union in their negotiations with the employer where disputes and differences arose, and in approval of their wage agreements. He further testified that he and several members of his factory union attended the conference with the company representatives on June 2 when they discussed who should have access to the plant during the strike; that Irving Moody, personnel manager of the company, asked at that meeting who would be allowed to enter; that the union men named five officials who would be allowed to go in, and after a discussion it was agreed to allow, in addition, certain maintenance men to enter; that the company had prepared and submitted a list of those they wanted to be let in, and during the conference some additions and

alterations to the list were made, including a provision concerning a change from company supervisors to union members to act as gatemen at the entrance gates. One of the company officials asked at the meeting whether the office force would be allowed to come to work during the strike and according to Daydif's testimony his answer was "No one would be allowed to cross the picket line." He further said that passes signed by the factory union secretary were issued to those designated by the union and no passes were issued by the company. When he arrived at the plant on the first morning of the strike, he stated he saw the gates were locked but that the union had nothing to do with such lockings. As to Local No. 1 and its affairs during the strike, Daydif testified that he had no discussions with them during the strike and that no members of that local were ever present at any consultations as to policy or actions affecting the controversy, nor were they ever invited to attend any meeting or conference.

John Papan, vice-president of Local No. 1, testified that Karl Daydif was not an officer of the office workers' local and that his capacity as president of the plant union constituted him only as advisory agent to the office employees. He said Daydif was not a member of the local's negotiating committee. Papan testified that at the time of the work stoppage, his union had no disagreement with the company, having theretofore negotiated a satisfactory agreement. He testified that he met E. W. Holman, office labor relations officer for the company, on June 2, the day previous to the strike, and that Holman asked him if the office local was going to be available and that witness answered that it was; that later Holman told him that "it was the company's request that we do not attempt to cross the picket line." After such conversation, Papan says he approached Daydif, and upon inquiry, the latter said there was going to be a picket line and that if the office employees insisted upon trying to enter the premises, they would do

so at their own risk. Papan said that after that word from Daydif, he had a conference with the office workers and then returned to Holman and advised him that they would be available for work. He further testified that he never attended any meetings of the plant union during the strike and that they never advised him of their negotiations, his only information coming from the newspapers. He said that the supervisors in the office took names, addresses and telephone numbers of office workers on June 2 and that he received no notice thereafter to come to work; that a good portion of the office workers reported for work on June 3, though none tried to get in to his knowledge, and that some of the files in the office were removed to a local hotel on June 2, including those pertaining to matters with which he was familiar in his office duties.

George Taylor testified that he was a supervisor and in charge of janitors; that he had charge of one gate for one hour the morning of June 3, while the night shift was leaving; that at seven thirty the gate was locked and he turned the key over to George Obenauf; that the east gates of the plant were locked all during the strike; that when he left work in the afternoon and entered the plant each morning he found the entrance gate locked. He testified that Frank Eaton, who was maintenance engineer of the company, told him to shut the entrance gate and that later some member of the union told him to put a chain on it. Eaton, when called to the stand by claimants, testified that he instructed Taylor to close and lock the gates. Two office employees testified that their supervisor asked them on June 2 for their telephone numbers and said he would advise them when to come back to work. They further testified that they did work for three days during the strike, (which entrance for special work appears from the other evidence to have been with the consent of the strikers to get out their payroll checks,) and upon completion of this part-time work, the supervisor said "that's all." Upon

their return to the office on the following day, they found the gates closed.

George Obenauf, called as a witness by the claimants, testified that he was on guard at the entrance gate, and that it was closed and locked practically all the time during the strike; that his orders were to keep it locked; that Frank Eaton and George Taylor gave him the orders; that the key was kept at the guard house inside the fence proper and that his further orders were that if a person did not have a pass signed by the union, he was not to admit him.

Fred Bartell testified that he kept the books of Local No. 1 and that he paid the factory union the sum of $132.74 in 1947 as the total of three quarterly payments of the one-fourth portion of the dues paid by his union members; that Local No. 1 received from the other union all of its stationery and membership cards and by-law printing.

An office employee testified that on June 2 his files in the office were removed in a pasteboard carton and taken away from the office that evening and that he found the gate locked. A cafeteria employee testified that she had a conversation with her department head on June 2, and that he told her there would be no work because there was going to be a strike; that this man came in later and took away all perishable foods; and that the cafeteria was used by both office and plant employees.

Irving Moody, called on behalf of appellant, testified that he was personnel manager for appellant and that he had a part in the negotiations between the company and both unions relative to amendments to the contracts, and that Daydif was in active participation in both instances. He further testified that he arranged for the meeting of June 2 between the plant union representatives and the company officials and that there was very much said at the meeting. He said that the first inquiry made by him was as to who would be able to go through the picket line and the reply he received was, "we are going to shut you down

completely." Upon inquiry from the company men, the union representatives refused to allow construction men, truck men or office employees to enter. As to the office workers, the question was, according to the witness, "how about office supervision, how about our office?" and the answer was, "No, we wouldn't allow them to come in, we want to hurt you just as much as you are hurting us." Moody testified that the company representatives said also, "except for the people you agree to let in, then certainly we don't want any trouble. We are going to tell your people not to cross the picket line" and "we'd close this gate here in order that we wouldn't have any violence through the picket line." He further said that at this meeting Frank Eaton had a list of men he thought he needed for plant maintenance; that the union representatives approved it with a few exceptions, and that thereafter passes were prepared for such employees and a list of their names posted on the bulletin board.

E. W. Holman, office relations manager of appellant, testified that he had a conversation with Papan, head of the office employees' union, after the signing of the agreement with that organization; that he told Papan that it looked like a strike by the factory men; that the company wanted the office employees to work and asked what they were going to do; that he told Papan that the management did not want any of the employees injured and that would be the reason they did not want the office help to work; and that Papan said he would take it up with his people. He said that Papan, on a day following, told him that the office employees would not cross the picket line as the factory employees would not allow them to do so. He testified that on June 25, during the strike, he had another conversation with Papan wherein Papan asked him whether office people were going to be allowed to go back to work and upon witness's counterquestion as to whether the office

employees were willing to cross the picket line, Papan said his office people felt they were locked out.

The foregoing sets forth substantially all of the oral testimony introduced by the parties. In addition there were presented and admitted as exhibits before the hearing officer, the contract and amendment thereto between the company and Local No. 1, and also the written affiliation agreement between said local and the factory employees' union. The pertinent provisions of the affiliation contract set forth that Local No. 1 had the right to negotiate with the management but any such agreement would have to be approved by the plant union; should any dispute arise in such negotiations, such dispute should be submitted to the plant union who should have the right to attempt to adjust the differences with the management; that each union should name a delegate who, with the president of each union, should meet once every three months to discuss policy matters; and that each member of Local No. 1 should pay dues of fifty cents per month, of which one fourth should be paid over to the plant union quarterly, the plant union reserving the right to levy an assessment on Local No. 1 provided the one-fourth was not sufficient to meet the expenses incidental to affiliation, taking into consideration the ability of Local No. 1 to pay the levy. The affiliation agreement provided for no other activity on the part of the factory union officers in the affairs of Local No. 1 and the evidence shows that there was no interference with or attention given to their actions or discussions on any other subject than the negotiations relative to the amendatory contract on wages. The mutual contract did not provide for any membership in the plant union or any attendance at its meetings by the office workers and it appears from the evidence that the latter were never consulted or asked for advice on any of the plant union affairs. This was true of both the factory union negotiations leading up to the strike and the action

taken to strike. The record is void of any approval or consent to strike given on the part of the office workers by action of the membership or any one of its officers.

We have reviewed these facts in detail because this case, of a type which has arisen in other States, is a case of first impression in Illinois and presents several questions which have had conflicting determinations in other jurisdictions. We do not intend to use this court as a final arbiter in every dispute upon conflicting issues of fact, unless findings which have been made by properly constituted administrative agencies are against the manifest weight of the evidence presented. We do, however, agree with the principle stated in *Bodison Mfg. Co. v. California Emp. Com.* 17 Cal. 2d 321, 109 Pac. 2d 935, wherein the California court held without dissent that the question presented is one of law involving the construction and the application of the statute. Where the decision of the administrative agency is against the manifest weight of the evidence, this court may review.

The Illinois statute and the similar statutes in other jurisdictions in this country have all descended from an English statute which uses the words "directly interested" to describe the type of employee who is not eligible for unemployment compensation and who is forced out of work because of a work stoppage. To determine the correct interpretation of the statute, it is of interest to investigate the history of the original English statute, (10-11 Geo. V, chap. 30, sec. 8(1), 1920.) This statute was passed, along with other social legislation, in England immediately following the first world war. Its purpose was to provide for unemployment compensation, and employees were disqualified totally after stoppage of work resulting from any labor dispute, whether or not the employees participated therein and whether or not they were at all interested in the results. The native injustice of such law was soon realized and in 1924 a change was made. (14-15 Geo. V,

chap. 30, section 4(1).) Under the amended statute compensation was permitted unless the employee participated in, financed, or was directly interested in the dispute. Thus, an exception was made to protect innocent employees and the statute as amended was the precursor to the statutes which have become so widely accepted in the United States. A construction of the words of similar statutes has limited the application thereof in this country to those who may receive a real betterment of one sort or another from the work stoppage, or to those creating the dispute or actively engaged in the furtherance thereof by participating therein. *Kieckhofer Container Co.* v. *Unemployment Com.* 125 N.J.L. 52, 13 Atl. 2d 646; *Dept. of Ind. Rel.* v. *Drummond,* 30 Ala. App. 78, 1 So. 2d 395; *Wicklund* v. *Com. of Unemployment Com.* 118 Wash. 207, 138 Pac. 2d 876.

It is of further interest to investigate the decisions relative to this statute and similar statutes in the American jurisdictions. In *Chrysler* v. *Smith,* 295 Mich. 438, 298 N.W. 87, the Michigan court held that two separate plants were part of the same "establishment" and that workers belonging to the same union who worked in the same types of jobs were ineligible for unemployment compensation. In *Rhea Mfg. Co.* v. *Industrial Com.* 231 Wis. 643, 285 N.W. 749, it was held that the acts of the union were not binding on the claimant for compensation so as to make her quitting voluntary, and that the choice remained open to each employee to remain or to quit work, the court pointing out that the conditions of an employment, however, held forth by an employer, might be so burdensome as to constitute a forced withdrawal. In *United States Coal Co.* v. *Unemployment Compensation Board of Review,* 66 Ohio App. 329, 32 N.E. 2d 763, the court was concerned with the definition of "strike" as synonymous with "labor dispute." The court in that case allowed compensation, accepting the definition of "strike" in Bouvier's Law Dictionary, to-wit: "A combined effort by workmen to obtain

higher wages or other concessions from their employer by stopping work at a preconcerted time." Finding no concerted cessation of work by the employees involved, but merely a series of circumstances which caused their unemployment, the court awarded compensation.

In a series of cases, *In Re St. Paul & Tacoma Lbr. Co.* 7 Wash. 2d 580, 110 Pac. 2d 877; *Aitkin v. Bd. of Unemployment Com.* 136 N.J.L. 372, 56 Atl. 2d 587; *Andreas v. Bates Com.* 14 Wash. 2d 322, 128 Pac. 2d 300; *Matter App. Pac. Tel. & Tel. Co.* 198 Pac. 2d 675; *Brown v. Maryland Unemployment Com. Board,* 55 Atl. 2d 696, the courts based their decisions upon facts as found and interpreted by the final ruling of the administrative agency appointed to administer the statute, reaffirming discretion granted to such agencies. Thus, we see in all the jurisdictions in this country a varied interpretation of statutes similar to section 7 of our Unemployment Compensation Act, (Ill. Rev. Stat. 1947, chap. 48, par. 223,) but we also find that nearly every case differs in some specific example from the other cases so that there is no general trend followed by the American jurisdictions, and each case must be decided upon its particular facts, keeping in mind the derivation of the statute, its legislative purpose, and the influence of previous interpretations.

The conclusion is unescapable that the legislature intended to provide for the innocent victims of a labor dispute by specifically excluding them from the denial of unemployment compensation. The previously quoted subsection of section 7 of the Illinois Act was meant to protect and except such victims from the classes denied compensation by its terms. Those who were to be excluded from benefits by the statute were those who attempted to gain by conduct which caused their unemployment or those who actively aided or abetted the previous group, whether or not they gained or lost. A proximity of conduct aiding or abetting the strikers or proximity of result to be gained

from the dispute were meant to be the measuring factors. The legislature did not intend to bar, because of remote claims of causation or result, those who were deprived of their employment from the benefits to be received under the act.

Appellant contends that its office employees were directly interested in the labor dispute and thus barred from eligibility for benefits. It must be conceded by the employer that no profit or increase in pay would accrue to office workers by any result that could come from the strike. They did not seek to share in any of the benefits that might accrue to the other employees, if the latter should obtain some by strike action. While the office workers' union was to pay part of their dues to the other union, there was no reciprocal payment of any kind provided for. The office employees had concluded their bargain with the management and had nothing further to gain. They were asking for nothing. No one had asked them to share in the labor dispute and they had not sought or volunteered to do so. We therefore are forced to conclude from our examination of the record that there is no substantial evidence that the claimants were directly interested in the labor dispute.

Appellant contends further that by reason of the affiliation agreement between the two unions, wherein the office workers were to pay a quarter of their dues into the plant union treasury, such workers have rendered financial assistance to the work stoppage, and are thus ineligible for unemployment benefits. Due to the small number of union members and the low rate of dues collected, the amount transmitted each three months from the one union to the other amounted to approximately $45. In return for this the office workers were to receive certain stationery and office supplies for their use. This amount is small, and is the same amount paid prior to any thought of a strike. No transfer of any payment was made during the duration of the strike, nor is there proof that the money previously

paid was used in any part for strike benefits or to assist in any particular in prolonging the strike. We agree with the director in his conclusion that the office workers were not financially assisting in the work stoppage.

On the issue of participation and interest in the work stoppage, appellant also says that the office workers refused and failed to cross the picket line in this particular case, and that such refusal and failure constituted a participation in the work stoppage. They have cited a number of cases from other States wherein the courts have stated the law to be that employees are barred from receipt of unemployment compensation under such circumstances. We have examined each of such opinions and find that in each case the court either made a finding that the unemployment was due to a refusal to cross a picket line or it was quite obvious that the only reason for the employees' failure to work was because they sympathized with the strikers and recognized their picket lines, thus refusing to cross. In the aforesaid cases, there appears no situation such as was presented to claimants in the instant case, in that there does not appear to have been any bar to return to work other than the picket line itself. Claimants before us were presented with an additional preventative to their entrance to the plant. The evidence conclusively shows that all gates but the entrance gate to the premises were locked during the strike and the entrance gate was kept locked except when those having passes were allowed to enter. One witness testified that the entrance gate would not close so as to fit the lock and that a chain was put upon it to secure its closing. The gateman did not have the key in his possession, but it was kept at the guardhouse within the premises. Obviously it would have been an idle gesture to have made the attempt to cross the picket line in the instant case. The gateman was told by management officers to allow no one without a pass to enter the premises. The gateman, being a member of the plant union himself, would certainly

not let the office people enter under the circumstances. There is no doubt but that the management agreed to the restriction involved. Perhaps it was the result of coercion used by the union officials, and the employer was compelled to agree to the entrance of maintenance employees only, for fear of damage or loss to the machinery and furnaces, but we find appellant's officers did agree to a situation which kept the office employees out of the plant and thus unemployed. Discussion as to the reason for such an agreement benefits no one, but the facts are apparent that this agreement was made. The management desired to preserve good relations with its employees and prevent violence because they would need these good relations in the future operation of their company. The factory union, on the the other hand, desired a complete stoppage. Although the purposes of the said union and the company management were in no way similar, both parties did agree on the pass method for entrance, and the office employees were the innocent victims of this agreement.

Counsel for appellant cites three Pennsylvania cases as authority for the proposition that mere fear of violence does not excuse the refusal to cross a picket line where a claim for unemployment insurance is in question. We have examined the decisions in such cases and have no disagreement with the conclusions therein reached under the peculiar circumstances involved. Papan, the vice-president of the office union in our case, testified that the office workers did have this fear and some of the company officials said they had the same fear. In this case, however, differing from the cases cited by appellant, it is not the fear of the employees which is involved as substantially as it is the apprehension of the company management for their safety. The desire on the part of the latter for future friendly relations with employees and for safe maintenance of the plant, made their fear of trouble the motivating cause for the agreement to exclude the claim-

ants herein. Because of this fear, the company made an agreement which resulted in an overt act preventing the office employees from entering the property. Therefore, using the exact cases cited by appellant and the principle of those cases, which is essentially that fear of violence alone is not an excuse, we must accept the conclusion that since it is not an excuse for employees refusing to work, neither must it be an excuse for management to commit an overt act preventing the employees from working.

If the management had wanted and requested its office workers to come in, they could have, and should have, left the gates and doors open. In *Department of Industrial Relations* v. *Drummond*, 30 Ala. App. 78, 1 So. 2d 395, the Alabama court, in a similar situation, said: "It thus appears that because of the apprehension of the employer company that to allow some employees to work when others were on strike would result in violence, the appellees were locked out of work by the published notices and close-down of the Wylam mine. This, therefore, was the direct cause of the appellee's unemployment and not the 'labor dispute' in which the affiliates were involved." The locking of the gates was the practical and physical cause of the unemployment of the office employees at appellant's plant, and there being before us nothing but speculation as to what the office workers would, or would not, have done as to crossing the picket line under different circumstances, we cannot say that either the failure to cross or a fear of violence on the part of the office employees, were the sole factors causing their nonreturn to work. The appellant maintained conditions which prevented the office employees from being put to a test on such subjects.

As to the office employees being of the same grade or class as the production workers, appellant presents but little argument in support of its claim. The principal case relied upon is that of *Copen* v. *Hix,* 43 S.E. (W. Va.) 2d 382.

An examination of that case reveals that the claimants therein were interested and participating in the strike of another union working at the coal mine, one being a foreman's union and the other the miners' union, and the decision cannot be an authority covering the matter of distinction according to grade or class. In *Prentice* v. *Unemployment Compensation Board*, 161 Pa. Super. 630, 56 Atl. 2d 295, also relied upon by appellant, we find the court's conclusion expressed therein that the two union organizations actually were joint participants in the labor dispute. The duties of the office workers in the case before us clearly put them in a different grade and a different class from those working in the production and maintenance end of the factory. Whether the class or grade is the same depends on the relationships existing between the various groups of employees who may be affected by the work stoppage. The affiliation agreement did not, by its terms, change their actual separate status so as to put them in the same class in case of a strike. The office workers had no right to vote, consult or assist in carrying on a work stoppage instituted by the factory employees, and the evidence shows they were actually disregarded in the matter. In the three cases heretofore cited from Alabama, New Jersey and Washington, we find holdings that utility workers did not belong to the same "class or grade" as production workers; that captive coal miners' union members having a separate management contract were in a different class from those belonging to the regular miners' union; and that railroad trainmen did not belong to the same grade or class of workers as sawmill employees. One important test laid down in those cases was to determine whether the union management agreements were separate or otherwise as to each group of employees. In the case before us, we do find the two separate agreements with the employer and we find no evidence of any otherwise concerted action

which would change the relation of different grade and class.

Being of the opinion that the findings of the Director of Labor were correct and not against the manifest weight of the evidence before him, the judgment of the circuit court of Lake County confirming the Director is affirmed.

*Judgment affirmed.*