(No. 33592.—

SHELL OIL COMPANY, Appellant, *vs.* ROY F. CUMMINS, Director of Labor *et al.*, Appellees.

*Opinion filed November 23, 1955—Rehearing denied Jan. 16, 1956.*

330

VERLIE, EASTMAN, SCHLAFLY & GODFREY, of Alton, OLIVER L. STONE, and IRVING SLIFKIN, both of New York, N. Y., (J. F. SCHLAFLY, JR., of counsel,) for appellant.

EMERSON BAETZ, of Alton, for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

This is an appeal by the Shell Oil Company, hereinafter called the Company, from a judgment of the circuit court of Madison County which affirmed a decision of the Director of Labor that certain employees of the appellant's Wood River, Illinois, refinery were entitled to unemployment compensation as a result of a work stoppage from August 22 to September 11, 1950. Since the appellant contends that these determinations were without evidentiary support and against the manifest weight of the evidence, we must now look to the facts of this case as disclosed by the record.

During the period with which we are concerned, 14 labor unions were represented at this refinery, namely (1) the Pipefitters, (2) the Asbestos Workers, (3) the Laborers, (4) the Bricklayers, (5) the Painters, (6) the Railway Carmen, (7) the Blacksmiths, (8) the Boilermakers, (9) the Electricians, (10) the Teamsters and Chauffeurs, (11) the Sheet Metal Workers, (12) the Carpenters, (13) the Operating Engineers, and (14) the Machinists. In addition to being affiliated with its corresponding international union, each of these locals, with the exception of the Operating Engineers and the Machinists,

were members of the Metal Trades Council of Wood River. Their international counterparts were also affiliated with the Metal Trades Department of the American Federation of Labor. The purpose of the Metal Trades Council and the department was to assist the individual unions in the conduct of their affairs and in negotiations with their employer.

In accordance with their customary practice and at the suggestion of the Metal Trades Council, negotiations for a new contract were commenced on March 14, 1950, between the Company, on the one hand, and a committee representing the Metal Trades Department and each of the 12 international unions, on the other, resulting in a proposed agreement which, although for the most part equally applicable to all the signatory unions, was also designed to cover problems peculiar to each craft. Thereafter, upon its being formally presented by the negotiating committee, this agreement was ratified and signed by each of the represented unions with the exception of the Pipefitters and Asbestos Workers, who demanded increased wages and different working conditions. Being unable to gain those additional concessions, a strike was ordered by these two unions on August 22, 1950, and a picket line composed exclusively of pipefitters and asbestos workers was immediately established. As a result, refinery operations were completely curtailed until September 11, at which time, and after negotiations were held between the Company and the Pipefitters' international, the strike was called off and the picket line withdrawn. Immediately, however, a strike was called and a picket line set up by the Operating Engineers, who were also demanding a wage concession. This, of course, resulted in the continued shutdown of refinery operations.

On September 17, 1950, and while the latter strike was in progress, the Company informed the Metal Trades Department that in view of current economic conditions and

in order to get all their employees back to work, they were prepared to offer a substantial wage increase. Thereafter, on September 21 and 22 joint conferences were held between the Company and representatives of the Metal Trades Department, the Metal Trades Council and all 14 of the individual unions, resulting in an agreed wage increase for all employees and termination, on September 23, of the strike being conducted by the Operating Engineers.

The claimants herein were members of the ten unions which, along with the Pipefitters and Asbestos Workers, made up the Metal Trades Council, and who, during the course of these labor disputes, had filed claims for unemployment compensation benefits. These claims were referred to a deputy commissioner who found (1) that there were two distinct and separate labor disputes involved— one being between the Company, on one hand, and the Pipefitters and Asbestos Workers on the other; the second being between the Company and the Operating Engineers, (2) that the employees could not cross the picket line without fear of bodily harm, but (3) that these claimants, along with the striking Pipefitters and Asbestos Workers Unions, "were all equally represented by one bargaining agent" and one contract, and were therefore directly interested in the dispute, in the same class or grade as the members of the striking unions, and thus, ineligible for benefits for the period from August 22 to September 11, the date that the above-mentioned unions terminated their strike. The deputy commissioner, however, was of the opinion that these claimants were eligible for unemployment compensation during the strike conducted by the Operating Engineers, who were not members of the Metal Trades Council. This latter ruling, having never been appealed, is not now in issue.

Having been denied benefits for the period from August 22 to September 11, 1950, these claimants thereupon appealed to the Director of Labor, who reversed the deputy

commissioner in this respect and held that these employees were entitled to compensation payments for the period above-mentioned. Upon administrative review, the circuit court of Madison County remanded the cause to the Director of Labor for the sole purpose of determining whether the claimants received the same general wage increase as was awarded the striking unions. After a hearing was had thereon, the record was transmitted back to the circuit court, where the Director's decision was affirmed. Direct appeal was then taken to this court.

Section 7(d) of the Illinois Unemployment Compensation Act (Ill. Rev. Stat. 1949, chap. 48, par. 223,) provides that an individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute, except where it is shown "that (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (2) He does not belong to a grade or class of workers of which immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute." To relieve the employee of this ineligibility, it is incumbent upon him to prove, not one, but both of these exceptions. (*Brown Shoe Co.* v. *Gordon,* 405 Ill. 384.) This statute further provides by section 7(a) that an individual shall be ineligible for benefits "For the week in which he has left work voluntarily without good cause and the six weeks which immediately follow such week." The appellant contends that these claimants (1) were directly interested in the labor dispute, (2) belonged to the same grade or class as those who did participate, (3) that by failing to cross the picket line they either participated in the dispute or voluntarily left work without good cause, and (4) that the award of compensation payments under

these circumstances would violate the public policy of this State. These are the points which we will now consider.

In support of its first contention, the Company points out that the 12 local unions, being members of the Metal Trades Council, did not carry on collective bargaining negotiations on an individual basis, but rather, such negotiations were conducted jointly with the view to entering into one contract which would be applicable to and binding upon each of the 12 organizations. It argues that by participating in both the original negotiations and the conferences of September 21 and 22, and by accepting the wage increase which resulted therefrom, these claimants made the dispute their own and were, therefore, directly interested in its outcome. With this we cannot agree. Representatives from each of the 12 unions met with the Company in the spring of 1950 for the purpose of negotiating a new labor contract, and as a result thereof, such an agreement was, on June 18, 1950, presented to each union for ratification. Thereafter, the claimants' unions accepted this contract and the Company continued to enjoy full production until the strike was called by the non-ratifying Pipefitters and Asbestos Unions. Any dispute which the ratifying unions may have had with the Company was settled by this agreement. Although we have held that a labor dispute, within the meaning of this act, may continue even after the signing of a working agreement (*American Steel Foundries* v. *Gordon,* 404 Ill. 174,) this disability terminates upon the resumption of normal production activity. (*Abbott Publishing Co.* v. *Annunzio,* 414 Ill. 559.) It is true that the ratifying unions took part in the conference of September 21 and 22, and that the claimants received a wage increase thereafter. However, it must be noted that this conference was called at the insistence of the Company and, as its superintendent testified, for the purpose of offering "a general wage increase" as a result of "a change in economic conditions of the country" which was brought about by the

Korean War. In its reply brief the appellant admits "that Shell's policy at the refinery has been not to make any substantial distinction in the wage rates paid to the various union crafts. In other words, a wage increase granted to one union would be granted to all." On the other hand, there was no evidence, whatsoever, to show that the claimants either requested further wage negotiations or, absent the picket line, would have failed to honor the terms of their prior agreement had a wage increase not been forthcoming. From these facts, we feel it was reasonable to conclude that, as to the ten ratifying unions, any wage increase which they received was voluntarily tendered by the employer for the purpose of creating good will and of promoting harmonious employment relationships. By accepting this generosity, these claimants cannot be said to have become directly interested in the labor dispute.

The appellant next contends that the 12 craft unions, all members of the same Trades Council, by jointly negotiating with the Company for a single working agreement had placed all their members in the same "grade or class" so that a strike by one would cause the ineligibility of all. In support thereof, it cites *Brown Shoe Co.* v. *Gordon,* 405 Ill. 384, and *Local No. 658, Boot and Shoe Workers Union* v. *Brown Shoe Co.* 403 Ill. 484. In these cases, all production and maintenance workers were members of and represented by the same union local. In both instances, although a new contract had been negotiated by this union and approved by its members, certain workers employed in the lasting department refused to abide thereby, resulting in the involuntary unemployment of other members. We held, upon these facts, that the claimants were of the same grade and class as the striking bedlasters, and for that reason, denied unemployment compensation benefits. The same reasoning, however, will not apply in the present case. Here we are dealing not with one but with 12 different unions and with 12 different bargaining agents. Although

it was customary for these unions to jointly negotiate with the employer and to have the resulting agreement embodied in a single document, yet there was in fact a separate contract existing between the Company and each of the 12 individual unions which, to be effective, required only the ratification of the particular union concerned. This is shown by the fact that in the present case, even though ten unions ratified the agreement, two others were free not only to reject these terms but also to take independent steps to enforce their demands. More similar upon its facts is the case of *Outboard, Marine & Manufacturing Co.* v. *Gordon*, 403 Ill. 523. There, two different unions were involved—one representing the factory employees and the other the office workers. Although it was customary for each union to have a separate contract with the employer, they were, by agreement, affiliated in such a manner that the office workers could negotiate only with the factory union's approval and that one fourth of the office union dues were paid into the factory union treasury. Prior to the dispute in question, the same men had represented both unions in contract negotiations with the Company and had presented their results to each individual union for ratification. The office workers accepted these terms but the factory employees proceeded to strike. In holding that the office workers were entitled to unemployment benefits, we pointed out that the claimants could neither vote against the strike nor voice their opposition thereto, and that the affiliation agreement did not, by its terms, change their actual separate status so as to put them in the same class as the striking employees. We feel that this reasoning is applicable to the present case. Here, although the 12 unions were affiliated by membership in the Metal Trades Council, there is no evidence to show that, by so doing, they surrendered their autonomous nature. Each union was free to act jointly or independently in presenting and enforcing its employment demands, and without regard to the wishes of the

others. It is true that in many cases, a single agreement indicates that all employee parties thereto are of the same grade and class. However, it is only one factor which must be considered and is not, in and of itself, conclusive. It is our opinion that these claimants did not belong to a grade or class of workers who participated in, financed, or were directly interested in this labor dispute.

The Company also argues that by failing to cross the picket line, these claimants either participated in the dispute or voluntarily left work without good cause. To decide this question, we must again look to the facts of the present case. The record discloses that on August 25, which was three days after the strike began, certain individuals entered Company property and removed four supervisors who had been living within the plant area. Two days later, on August 27, an effort was made to bring a carload of food into the plant but was strongly resisted by the pickets. After a short struggle in which one individual was injured, the sheriff intervened and the entry made without further incident. Testimony was offered showing that 8 to 12 armed deputies were assigned to plant protection at the Company's request and immediately following the initial work stoppage for the purpose of preventing any possible damage which might result therefrom. There was also evidence that as many as 100 pickets were on duty at a particular time and that, in view of the very explosive nature of a refinery, special care was taken to avoid creating a situation from which violence might result. From these facts we must conclude that the claimants were justified in refusing to cross the picket line. In order to be eligible for unemployment benefits it is not necessary that the claimant actually experience violence or bodily harm in attempting to cross the picket line—a reasonable fear of such results is sufficient. (*Local Union No. 222, Oil Workers Int. Union* v. *Gordon,* 406 Ill. 145; *American Brake Shoe Co.* v. *Annunzio,* 405 Ill. 44; *Lanyon* v. *Administrator*

*Unemployment Comp. Act.* 139 Conn. 20, 89 A. 2d 558; *Meyer* v. *Industrial Commission of Missouri,* 240 Mo. App 1022, 223 S.W. 2d 835.) Furthermore, such fear may arise not only from actual violence itself but also from its potential. Because of the extreme dangers inherent in an oil refinery and in view of the large number of pickets involved, it was reasonable in this case that such fear should arise even before actual violence occurred. By so acting upon these facts, the claimants neither participated in this dispute nor voluntarily left work without good cause.

Neither do we believe that an award of compensation payments under these circumstances would violate the public policy of this State. We have, on many prior occasions, held that the Unemployment Compensation Act must be liberally construed so as to provide sustenance to those who are unemployed through no fault of their own and who are willing, anxious, and ready to work if given the opportunity. (*Mohler* v. *Department of Labor,* 409 Ill. 79; *Barrett* v. *Wasson Coal Co.* 404 Ill. 11; *Fash* v. *Gordon,* 398 Ill. 210; *American Medical Assn.* v. *Board of Review of Dept. of Labor,* 392 Ill. 614; *Crouch* v. *Murphy,* 390 Ill. 112; *Lindley* v. *Murphy,* 387 Ill. 506; *Grant Contracting Co.* v. *Murphy,* 387 Ill. 137.) The claimants, in this case, meet the above test.

It is our opinion that the findings of the Director of Labor were neither without evidentiary support nor against the manifest weight of the evidence, and for that reason, should not be disturbed on review. (*Abbott Publishing Co.* v. *Annunzio,* 414 Ill. 559; *Liberty Foundries Co.* v. *Industrial Com.* 373 Ill. 146.) The judgment of the circuit court of Madison County is, therefore, affirmed.

*Judgment affirmed.*