GENERAL MOTORS CORPORATION, Plaintiff-Appellant, *v.* WILLIAM M. BOWLING, Director, Department of Labor, *et al.*, Defendants-Appellees.

First District (5th Division)   No. 79-453

Opinion filed May 16, 1980.—Modified on denial of rehearing August 29, 1980.

Pope, Ballard, Shepard & Fowle, of Chicago, for appellant.

William J. Scott, Attorney General, of Chicago (Joseph D. Keenan, III, Assistant Attorney General, of counsel), for appellee William M. Bowling.

Harold A. Katz, Irving M. Friedman, and Michael B. Erp, all of Chicago (Katz, Friedman, Schur & Eagle, of counsel), for appellees UAW Local 694 and individual employee-claimants.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff appeals from an order affirming the Director of Labor's

determination that claimant-defendants are eligible for unemployment benefits. The issues presented are (1) whether claimants' unemployment was due to a stoppage of work caused by a labor dispute at the establishment where claimants were employed; (2) whether claimants were directly interested in the labor dispute; and (3) whether claimants financed the labor dispute.

The facts in this case are not disputed. Claimants herein are among the 275 shop clerks employed at General Motors' two Electro-Motive Division plants in Chicago and LaGrange, Illinois, and are members of Local 694 of the International Union, United Automobile Aerospace and Agricultural Workers of America (hereinafter "International Union"). Approximately 7,000 production workers also are employed at the two plants, and they are members of Local 719 of the International Union.

The terms of employment for the production workers are embodied in a "National Agreement" which is negotiated in Detroit. The terms for the shop clerks are negotiated separately by Local 694 and are set forth in a "Master Agreement." It was customary for General Motors and Local 694 not to negotiate the Master Agreement until the National Agreement was finalized, and certain major items settled in the negotiations of the National Agreement would then be incorporated in the Master Agreement.

Both contracts with General Motors were set to expire late in 1970 and, pursuant to the International Union's constitution, double dues were assessed on all union members for a few months prior to the expiration date in order to build up its strike fund. On September 15, 1970, during negotiations on the new National Agreement, the production workers went on strike at both plants in response to a selective strike called by the International Union. Picket lines were set up at both plants, although claimants crossed the lines with official passes issued by the International Union and continued to work. Since production had ceased, work eventually ran out and claimants were sent home. Some of the claimants assisted Local 719 by writing the checks issued to the strikers and keeping records. Also during the strike, claimants' Local 694 was negotiating a new Master Agreement with General Motors.

On November 11, 1970, a new National Agreement was reached, and shortly afterward the Master Agreement was finalized, incorporating certain key elements of the National Agreement such as wages, pensions, insurance, bereavement pay, holiday pay, and vacation pay. Production was completely resumed on November 23, 1970, after which certain union members who worked during the strike, including claimants, were assessed emergency strike fund dues of $20 per member.

Claimants filed for unemployment benefits for the period of time in which they did not work. The Director of Labor originally determined

that claimants' unemployment was not due to a stoppage of work resulting from a labor dispute and, accordingly, allowed the benefits. Plaintiff filed a complaint for administrative review, and the circuit court reversed, holding that claimants' unemployment was caused by a labor dispute, and remanded the case to determine whether claimants were protected by the "relieving proviso" of section 604 of the Unemployment Insurance Act (Ill. Rev. Stat. 1977, ch. 48, par. 434); namely, whether they "had not financed" and "were directly interested in the dispute"—in which case they would nonetheless be entitled to benefits. The Director, in turn, found that claimants were protected by the relieving proviso and allowed the benefits. The circuit court upheld the Director on administrative review, and plaintiff appeals from that affirmance.

OPINION

The matters presented in the instant litigation are governed by section 604 of the Unemployment Insurance Act, which provides as follows:

"An individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed. * * * This section shall not apply if it is shown that (A) the individual is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (B) he does not belong to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * * . If in any case, separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this Section, be deemed to be a separate factory, establishment, or other premises." Ill. Rev. Stat. 1977, ch. 48, par. 434.

The Director of Labor, in affirming his representative's findings on remand, held that claimants were entitled to unemployment compensation because they fell within the "relieving proviso" of section 604 in that they (1) did not participate in, finance, or possess a direct interest in the labor dispute; and (2) were not members of the same grade or class of workers who participated in, financed, or were directly interested in the dispute. In reviewing these findings, we note that the relevant facts are uncontradicted and, under such circumstances, we note that the standard

of review to be employed was explained by the supreme court in *Kensington Steel Corp. v. Industrial Com.* (1944), 385 Ill. 504, 53 N.E.2d 395, as follows:

> "Where facts are not in dispute, their legal effect become a matter of law and the rule as to the power of the court to set aside the decision only when it was made against the manifest weight of the evidence has no application, and upon questions of law this court is not bound by the decision of the [administrative agency]." (385 Ill. 504, 509, 53 N.E.2d 395, 397.)

Also see *Caterpillar Tractor Co. v. Department of Revenue* (1963), 29 Ill. 2d 564, 194 N.E.2d 257; *Schoenbein v. Board of Trustees* (1965), 65 Ill. App. 2d 379, 212 N.E.2d 380. We are cognizant also of the cases holding that the decision of an agency on a point of law is nonetheless entitled to great weight (see *Legg v. Illinois Fair Employment Practices Com.* (1975), 28 Ill. App. 3d 932, 329 N.E.2d 486).

We turn then to the first issue; namely, whether claimants' unemployment was due to a stoppage of work which existed because of a labor dispute at the establishment. The Director and Local 694 assert that it was not. It is first argued that claimants' unemployment was not due to a labor dispute but was the result of a managerial decision to lay off claimants because of a lack of available work. At the hearing before the Director's representative, John Marohnic (plaintiff's assistant divisional personnel director) testified that there was no other reason for claimants' unemployment other than the strike; that there would have been enough work for claimants had there been no strike; and that Electro-Motive "told each one of these people (claimants) either written or verbal, and that they are being sent home because of labor difficulties between General Motors Corporation and the International UAW." The witness also explained, "I am saying they were sent home because of the strike situation. We had no manufacturing in the plant, and there was no work for these people to do, clerical work as a result of the strike." Defendants have pointed to no contradictory testimony and, in view thereof, we think it is clear from the record that claimants' unemployment was due to a stoppage of work which existed because of a labor dispute at the establishment.

We see no merit in the further contention of Local 694 that section 604 is inapplicable to claimants since they were not engaged in any concerted activity. In support, it cites *Outboard, Marine & Manufacturing Co. v. Gordon* (1949), 403 Ill. 523, 536, 87 N.E.2d 610, 617, where the court, in summarizing the decision in *United States Coal Co. v. Unemployment Compensation Board of Review* (1940), 66 Ohio App. 329, 32 N.E.2d 763, stated: "Finding no concerted cessation of work by the employees involved, but merely a series of circumstances which

caused their unemployment, the court awarded compensation." Local 694 argues that since claimants were not involved in a concerted cessation of work, section 604 is inapplicable against them. We are not persuaded by this argument, however. As stated by the court in *Outboard, Marine*, the court in *United States Coal Co.* "was concerned with the definition of 'strike'" and concluded that it should be defined as a concerted cessation of work. (403 Ill. 523, 536-37, 87 N.E.2d 610, 617.) That passage has no relevance to the case at bar, where it is not contended that claimants themselves were engaged in a strike. Further, the *Outboard, Marine* case did not rely upon *United States Coal* but merely mentioned it as an example of the foreign cases which have interpreted unemployment insurance statutes similar to ours.

■■ Defendants also assert that claimants (shop clerks) and production workers represent separate branches of work which are commonly conducted in separate premises; that under the statute their departments should thus be deemed to be separate factories or establishments; that claimants' unemployment was therefore not due to a stoppage of work which existed because of a labor dispute at their factory or establishment; and that accordingly claimants are not ineligible under section 604. In support, *Caterpillar Tractor Co. v. Durkin* (1942), 380 Ill. 11, 42 N.E.2d 541, is cited, wherein the supreme court noted that a pattern shop located in the factory plant could be considered a separate establishment inasmuch as "[p]attern making is recognized as a specialized trade." (380 Ill. 11, 15, 42 N.E.2d 541, 542.) We are not persuaded that such a distinction between departments can be properly drawn in the instant case, however. In this regard, we note Marohnic's testimony that claimants "are shop, clerical employees. Some do typing, some do record keeping, some do follow-up work, some do scheduling. All jobs related to manufacturing." It thus appears clear that the duties performed by the shop clerks were concomitant with the work performed by the production workers, and we conclude they cannot be regarded as having been employed in separate establishments.

Having confirmed that claimants are initially subject to section 604, we turn to the question as to whether the trial court was correct in holding that they nonetheless qualified for unemployment benefits under the "relieving proviso." Plaintiff contends that this holding was improper, for two reasons.

First, plaintiff asserts it was not shown (as required by section 604) that claimants were not "directly interested in the labor dispute which caused the stoppage of work." It argues that this direct interest existed in that claimants work for the same employer as members of the striking Local 719; that claimants and the strikers are both members of International Union, although they belong to different locals; that

claimants also had a "dispute" with plaintiffs at the time of the strike in that their contract also had expired and a new one was being partially negotiated; and that after the strike, key terms settled between the union and plaintiff were automatically incorporated into claimants' contract, as a matter of practice. In support of its position, plaintiff points to *Shell Oil Co. v. Cummins* (1955), 7 Ill. 2d 329, 131 N.E.2d 64. In that case, the workers at Shell's Wood River refinery were represented by 14 various unions. All except two were affiliated with their corresponding international unions as well as the Metal Trades Council of Wood River, and the international counterparts were affiliated with the Metal Trades Department of the American Federation of Labor. Negotiations for a new contract for all workers commenced between Shell and a committee consisting of representatives of the Metal Trades Department and the international unions. An agreement was reached and then ratified by each union, except for the Pipefitters and Asbestos Workers who demanded higher wages and different working conditions. These unions struck, resulting in a shutdown of refinery operations. The strike was later called off, at which time the Operating Engineers struck, and the refinery remained inoperative. Shell then informed the Metal Trades Department that it was prepared to offer another wage increase to all workers due to a change in the economy, and joint conferences were held with the Metal Trades Department, Metal Trades Council, and the unions. An agreement was reached on wages, and claimants (who were members of unions that did not strike) filed for unemployment benefits for the time during which the refinery was shut down. Shell opposed payment of the benefits, arguing that claimants were "directly interested" in the dispute involving the Pipefitters, Asbestos Workers, and Operating Engineers in that all unions bargained jointly in the original negotiations as well as the subsequent conferences called by Shell. The supreme court disagreed, however, noting that any dispute claimants had with Shell was resolved at the original negotiations, prior to their unemployment, and stated:

> "[W]e feel it was reasonable to conclude that, as to the [claimants], any wage increase which they received was voluntarily tendered by the employer for the purpose of creating good will and promoting harmonious employment relationships. By accepting this generosity, these claimants cannot be said to have become directly interested in the labor dispute." (7 Ill. 2d 329, 336, 131 N.E.2d 64, 68.)

Plaintiff here argues that *Shell Oil* "impliedly supports" its contention that claimants possessed a direct interest in the dispute. It essentially urges that, had the three unions in *Shell Oil* struck before claimants had accepted a settlement, claimants would have been disqualified from receiving benefits since they would have had a direct interest in the

dispute. This would obtain, it argues, because claimants would have anticipated during the dispute that they too would receive the increased wages they were seeking as a result of the strike.

■■ We cannot agree with this assessment of *Shell Oil*, however, as we have no way of knowing how the supreme court would have ruled had the facts there been different. Further, we believe the instant case is controlled by *Nestle Co. v. Johnson* (1979), 68 Ill. App. 3d 17, 385 N.E.2d 793. There, 170 employees at Nestle's Granite City plant were represented by the International Association of Machinists and Aerospace Workers District 9, and it appears that seven were represented by the International Union of Operating Engineers Local 149. Each union had separately negotiated contracts. In past practice, the machinists would negotiate first and, for the three most recent contracts, the engineers received the same economic package as the machinists. When both contracts expired, the machinists went on strike, and the engineers refused to cross the picket lines, fearing bodily harm. The engineers filed for unemployment benefits, which were allowed. Nestle objected on the basis that the engineers possessed a direct interest in the dispute, since they could have anticipated increased benefits as a result of the machinists' strike. This court held that the engineers were not directly interested in the dispute and upheld the benefits, stating:

> "Though both the smaller union and the company had found it convenient to wait until the larger union achieved a contract before beginning their negotiations, and in the past the economic terms of both unions' contracts had been the same, the operating engineers had no enforceable right to the benefits obtained by the machinists. The mere expectancy of better economic terms in their own new contract upon conclusion of the machinists' strike did not give the operating engineers a direct interest in the machinists' labor dispute. (See *Shell Oil Co. v. Cummins*, 7 Ill. 2d 329, 131 N.E.2d 64 (1955).) At the most, this record reveals an indirect interest in the outcome of the machinists' strike; that is not sufficient for the denial of benefits. See *Outboard, Marine & Manufacturing Co. v. Gordon*, 403 Ill. 523, 87 N.E.2d 610 (1949)." (68 Ill. App. 3d 17, 20, 385 N.E.2d 793, 796.)

We recognize that the claimants and strikers in *Nestle* did not belong to the same international union as do the parties in the instant case. This we view to be of no significance, however, since it is clear that, as in *Nestle*, claimants here possessed no more than a "mere expectancy of better economic terms in their own new contract upon conclusion of" the production workers' strike. We accordingly hold that claimants did not have a direct interest in the labor dispute.

■■ The second reason asserted by plaintiff in support of its contention

that claimants were improperly found qualified under the relieving proviso is that they have not shown they were "not * * * financing * * * the labor dispute which caused the stoppage of work." To support this position, it points out that Local 719 members received strike benefits from the International Union during the strike; that four months prior to the strike, claimants (as well as other members of the International Union) were assessed double dues to build the International's strike fund; and that, after the strike ended, certain members who had worked during the strike (including claimants) were assessed additional emergency strike dues. It is the position of defendants that claimants were merely paying dues, which they argue should not be considered as financing the strike in question.

The record discloses that the strike was called on September 15, 1970, but claimants' local did not participate in it; that in the summer of 1970, the International Union assessed double dues to build up its strike fund; that this assessment included claimants and other members of the International; that payments were made to the strikers from the said fund; that after the strike, the union members who had worked during the strike (including claimants) were assessed further additional emergency dues to support the strike; and that members of claimants' local, when laid off, were given strike benefits in the same amount under an argeement that they would reimburse the union to the extent that they received unemployment compensation payments. In opposing this position of plaintiff, defendants rely upon *Outboard, Marine & Manufacturing Co. v. Gordon* (1949), 403 Ill. 523, 87 N.E.2d 610, where factory employees in a plant were represented by one union and the office workers in the same plant by another union. By reason of an affiliation agreement between them, the office workers' union agreed to contribute one-fourth of its dues each quarter to the factory workers' union. The factory workers went on strike, and passes were issued to certain personnel to cross picket lines, but none were issued to the office workers who did not work for the duration of the strike. After the strike, the office workers filed for unemployment benefits—which were allowed. Pertinent among the employer's objections was that the office workers helped to finance the strike by virtue of the fact that one-fourth of their dues payments was forwarded to the factory workers' union. The supreme court disagreed, however, stating:

> "Due to the small number of [office workers'] union members and the low rate of dues collected, the amount transmitted each three months from the one union to the other amounted to approximately $45. In return for this the office workers were to receive certain stationery and office supplies for their use. This amount is small, and is the same amount paid prior to any thought

of a strike. No transfer of any payment was made during the duration of the strike, nor is there proof that the money previously paid was used in any part for strike benefits or to assist in any particular in prolonging the strike. We agree with the director in his conclusion that the office workers were not financially assisting in the work stoppage." (403 Ill. 523, 537-38, 87 N.E.2d 610, 618.)

We do not believe, however, that *Outboard, Marine* is controlling here, where the constitution of the International Union sets dues at two hours straight time pay per month. Since the 275 shop clerks were assessed double dues to build up the strike fund during the four months prior to the strike, as well as emergency strike fund dues of $20 per member after the strike, it is clear that the amounts were not insubstantial. Further, there is nothing in the *Outboard, Marine* opinion to indicate that any portion of the dues contributed to the factory union was to be used either to develop or enhance a strike fund. In fact, it appears that the small amounts paid were for expenses incidental to the affiliation and for which the office workers union also received all of its stationery, membership cards and bylaw printing. Here, the doubling of the dues was for the express purpose of building such a fund, and it is undisputed that the strikers here received benefits from that fund during the work stoppage.

Moreover, we see no merit in the suggestion of defendants that *Sangamo Electric Co. v. Donnelly* (1962), 26 Ill. 2d 348, 186 N.E.2d 230, is supportive of their position. In *Sangamo*, the court held that the claimants could not recover unemployment compensation because they had participated in a work dispute of another union. There was also a contention that the claimants financed the labor dispute, because a portion of their monthly union dues was used to pay benefits to the members of the striking union. While the Director of Labor found that this was not a financing within the meaning of the statute, we note that the supreme court did not review this finding, stating: "[I]n view of his [the Director of Labor's] holding and our approval that these workers were prevented from recovering unemployment compensation because of their participation in the labor dispute it is unnecessary for us to consider this question." 26 Ill. 2d 348, 360, 186 N.E.2d 230, 236.

In the light of the foregoing, we feel that we have no choice but to conclude that the claimants here contributed to the financing of the strike and that they are therefore ineligible to receive unemployment benefits for that period of time. We are not unmindful that claimants may be placed in a difficult situation by the "financing" provision in the unemployment compensation statute. We believe, however, that our conclusion has merely employed the plain meaning of the Act, and it should be noted that it is not the province of the courts, but rather that of the legislature, to delete this provision, as indeed many States have done

214

in enacting similar statutes. See Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification*, 17 U. Chi. L. Rev. 294, 328 (1950).

For the reasons stated, the judgment affirming the Director of Labor in allowing the payment of benefits is reversed.

Reversed.

LORENZ and WILSON, JJ., concur.