(No. 37306.)

Sangamo Electric Company, Appellant and Cross Appellee, *vs.* Robert R. Donnelly *et al.*, Appellees and Cross Appellants.

*Opinion filed November 30, 1962.*

DALLSTREAM, SCHIFF, HARDIN, WAITE & DORSCHEL, of Chicago, and ENSEL, JONES & BLANCHARD, of Springfield, (JAMES B. O'SHAUGHNESSY and GEORGE K. BLANCHARD, of counsel,) for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and A. ZOLA GROVES, Assistant Attorneys General, of counsel,) for appellees Director of Labor *et al.*

G. W. HORSLEY, ROBERT F. VESPA, ALLEN T. LUCAS, and CHARLES G. TISCKOS, all of Springfield, for appellees Selco Union *et al.*

Mr. JUSTICE HERSHEY delivered the opinion of the court:

This is an appeal by Sangamo Electric Company, hereinafter called the Company, from the portion of the judgment of the circuit court of Sangamon County affirming that portion of a decision of the Director of Labor holding that employees of the Company who were members of Selco Union were entitled to unemployment compensation as a result of work stoppage from November 2 to November 30, 1960. Also included is a cross appeal by the employees of

the Company who were members of Selco Union from that portion of the judgment of such circuit court affirming the portion of the decision of the Director of Labor holding that such Selco members were ineligible for unemployment compensation from November 30, 1960, when an injunction issued limiting the number of pickets at each picket post, until December 10, 1960, when work resumed. Likewise, a cross appeal is presented by the employees of the Company who were members of the Maintenance Unit of Lodge 628, International Association of Machinists, from the portion of the judgment of said court affirming that portion of the decision of the Director of Labor holding these employees ineligible for unemployment benefits for the entire duration of the strike.

In this type of case, this court has held that the findings and conclusions of the Director of Labor should not be set aside unless contrary to the manifest weight of the evidence or unless there is no substantial evidence to support them. (*Outboard Marine & Manufacturing Co.* v. *Gordon,* 403 Ill. 523; *Drezner* v. *Civil Service Com.* 398 Ill. 219.) It therefore is necessary to examine the facts of the case as disclosed by the record.

Plaintiff Sangamo Electric Company is a manufacturer of electrical devices and equipment and has one of its plants in Springfield, Illinois. During the time concerned it had 2790 employees of whom 1670 were production employees and members of Selco Union. One hundred thirty-three were tool and die makers (hereinafter called the Tool and Die Unit) who were members of Lodge 628 of the International Association of Machinists, and 85 were maintenance workers (hereinafter called the Maintenance Unit) who also were members of Lodge 628 of the International Association of Machinists. The remaining employees were nonunion supervisory, clerical and miscellaneous employees. The Selco Union employees, employees of the Tool and Die Unit and employees of the Maintenance Unit each were

separate bargaining units and each had a separate labor contract with plaintiff.

The Tool and Die Unit's labor contract with the Company expired at midnight November 1, 1960, and negotiations for a new contract having failed, the employees in the Tool and Die Unit struck on November 2, 1960. The contract of the Maintenance Unit and the separate contract of the Selco Union employees had considerable time yet to run, so that these two groups of employees still were under contract and did not strike. The Tool and Die Unit employees set up picket posts around the plant and placed pickets shoulder to shoulder at the gates. The evidence showed many acts of violence on the picket line. This continued until the Company on November 30, 1960, obtained and served an injunction of the circuit court of Sangamon County limiting the number of pickets at each picket post. The strike of the Tool and Die Unit continued until December 10, 1960. During the period of this strike by the Tool and Die Unit employees, the production employees of the Company, members of Selco Union, did not work. Also, the members of the Maintenance Unit did not work, except for 16 employees who, along with 3 matrons and 1 truckdriver, were permitted by preagreement to pass through the picket lines as a skeleton crew for plant protection. Nonunion supervisory, clerical and office personnel worked without interruption. Claimants were not on strike nor did they work during the entire period of the strike.

A hearing was had on the claims before a deputy of the Division of Unemployment Compensation. He denied the claims entirely. Thereafter, on review before the Director of Labor's representative, a hearing was held, after which his report was made and adopted by the Director of Labor. The findings of the representative were: "(1) There was a labor dispute between the Sangamo Electric Company of Springfield, Illinois, and the tool and die makers employed by them, represented by Lodge # 628 of the International

Association of Machinists from November 2, 1960 to December 10, 1960, inclusive. (2) There was a stoppage of work at the Company's plant at Springfield, Illinois, during said period. (3) The stoppage of work existed because of the said labor dispute. (4) The unemployment of all appellants herein between November 2, 1960 and December 10, 1960, was due to the stoppage of work which existed because of the labor dispute at the premises of the above named employer. (5) Maintenance workers employed by the said employer and members of the said local union had a separate contract and were not directly interested in the labor dispute. (6) The said maintenance workers did not finance the said labor dispute. (7) The said maintenance workers participated in the labor dispute by respecting the picket line of the tool and die makers, thereby withdrawing their services from the employer, or were members of a grade or class of workers some of whom participated in the labor dispute by respecting the picket lines of the tool and die makers. (8) The production workers represented by Selco Union # 1, were not directly interested in the labor dispute and did not finance the said labor dispute. (9) With respect to the period from November 2, 1960, to November 29, 1960, the said Selco Union members did not participate in the labor dispute which caused the stoppage of work at the premises of the employer, since they were prevented from entering the plant by a reasonable fear of bodily harm based on incidents which occurred between their members and the pickets. (10) With respect to the period from November 30, 1960, to December 10, 1960, the members of the Selco Union participated in the labor dispute which caused a stoppage of work at the premises where they were employed since the issuance of an injunction reduced the number of pickets at the premises of the employer and made it possible for them to enter the plant without reasonable fear of bodily harm, and their unemployment for the said

period was due to their failure to take advantage of the opportunity thus afforded them."

The Director of Labor ordered that the members of Selco Union be held eligible for benefits for unemployment from November 2, 1960 to November 29, 1960, inclusive, and ineligible for benefits for unemployment from November 30, 1960, to December 10, 1960, inclusive, and that the claimants who were members of Lodge No. 628 of the International Association of Machinists were ineligible for benefits during the entire period from November 2, 1960, to December 10, 1960, inclusive. Sangamo Electric, Selco and the Maintenance Unit employees filed administrative review actions. These two proceedings were consolidated. Thereafter, the circuit court affirmed the decision of the Director of Labor.

Section 604 of the Illinois Unemployment Compensation Act (Ill. Rev. Stat. 1959, chap. 48, par. 434) provides that an individual shall be ineligible for benefits for any week with respect to which it is found his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute, except where it is shown "that (A) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (B) he does not belong to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute." It has been consistently held that to relieve the employee of this ineligibility, it is incumbent upon him to prove, not one, but both of these exceptions. *Brown Shoe Co.* v. *Gordon,* 405 Ill. 384; *Shell Oil Co.* v. *Cummins,* 7 Ill.2d 329.

The questions here appear primarily ones of fact. It is correctly admitted by the Company that as to the Selco Union employee claimants, the question is whether they were

"participating in" the strike of the Tool and Die Unit workers.

This court has held that where employees of the same employer, who are members of an entirely different labor organization and have no interest in or connection with the labor dispute, fail to cross a picket line of another labor organization of the employer for the reason of "respect" of that picket line, such employees are not entitled to unemployment benefits. (*American Brake Shoe Co.* v. *Annunzio,* 405 Ill. 44.) In that case there was abundant testimony that the picketing was peaceful, there was ample police protection and the claimants were members of an entirely different union and could have, if they had chosen to do so, entered their place of employment without threat of bodily harm. The testimony further showed that the employees did not cross the picket line because they did not care to be classified as "scabs" by fellow employees. In other words, they were unemployed solely because, in accordance with their union principles, they did not choose to work in a plant where certain employees from another plant of their employer were conducting picketing.

This court also has held that failure to cross a picket line by a group of employees belonging to a separate union from the one striking, for the reason that the employees had a reasonable fear they would experience violence or bodily harm, is sufficient reason to cause them to be eligible for unemployment benefits and negates any contention that they were participating in the labor dispute. (*Shell Oil Co.* v. *Cummins,* 7 Ill.2d 329.) Further, such fear may arise not only from actual violence itself but also from its potential. *Shell Oil Co.* v. *Cummins.*

In the instant case, some 24 witnesses testified in great detail as to acts of violence and threats on the part of the striking tool and die employees. Even the Company itself admitted the violence and threat of bodily harm engendered by the striking employee pickets to those employees who

sought to enter the plant to work. The witnesses all agreed that from November 2, 1960, until November 30, 1960, the pickets were massed at gates 1 and 3 of the Company, shoulder to shoulder, so that no Selco employee could go through the gates without body contact with the pickets. Incidents of fist fights, torn clothing, people being shoved and knocked down, women being carried across the street, one picket having a gun, another being intoxicated and a police dog on the picket line, and other acts of misconduct on the part of the pickets were fully related by the witnesses.

Verbal threats made to Selco employees attempting to enter the plant were told by numerous witnesses. A letter from John Patton, industrial relations manager of the Company, to the striking Union complained of intoxicating liquor on the picket line and of the police dog and other acts giving the Selco employees reasonable cause to fear bodily violence. Further, the verified complaint for injunction filed on November 30, 1960, by the Company alleged the violence testified to by the aforesaid witnesses, the massing of pickets and other acts of threatened violence by the pickets to those seeking to enter the plant. All this testimony related to the period prior to the Company's obtaining the injunction on November 30. Further incidents of violence were testified to by the witnesses as well as alleged in the injunction complaint when as many as 600 Selco employees gathered and attempted to enter gates 1 and 3. Also, on November 29, a loaded truck attempting to leave the loading dock in the south parking lot was obstructed by pickets, the driver threatened, and the truck prevented from leaving. Thereafter, on November 30, 1960, an injunction was obtained by the Company limiting the strikers to one picket per picket post. The testimony shows this injunction was obeyed and thereafter the employees of Selco Union generally remained away from the plant.

The evidence is overwhelming that there not only was reasonable fear by Selco Union employees of bodily harm

in attempting to cross the picket line, but acts of bodily contact and harm and violent threats occurred. It is the position of the Company that this did not show the Selco workers were involuntarily out of work since there was another entrance to the plant, less heavily picketed, which these employees could have used but never tried to enter. This was known as Gate 6.

The evidence showed that the plant is bounded by four streets, Ninth Street on the west, Converse Avenue on the north, Eleventh Street on the east, and North Grand Avenue on the south. Gate 1 was located on Eleventh Street and Gate 3 on Converse Avenue. It was admitted that these entrances were near the street and had a tall fence around them with a gate entrance; that Gate 1 was only the size of a door; and that Gate 3 was of a size large enough to admit a truck. The employees' badges were kept at Gates 1 and 3 and they were accustomed to be checked in and out at these gates. Gate 6 was a small door entrance off of an automobile parking lot on the south side of the plant, which door was some 300 to 400 feet north of North Grand Avenue. Gate 6, from the photograph exhibit showing it, is primarily a truck loading and unloading ramp and only a small door provides walking access into the plant. Witnesses testified that there was a picket post on the North Grand Avenue side and that as many as eight pickets patrolled the sidewalk along the edge of the entrance to the parking lot. No fence was present on this south side except for a small one along the corner, but to enter the plant through this entrance some 300 to 400 feet into the plant from the sidewalk had to be travelled and car-block stops and parked cars had to be avoided in walking.

Examination of the picture exhibit of Gate 6 and its location as above described are sufficient to show the falsity of the Company's argument. This clearly was not customarily used as a normal entrance or exit of employees to and from the plant. Further, its location was such as not

to provide a proper entrance nor a safe one. Employees are not required to seek just any opening by which they possibly may enter a plant in case of a strike. The posting of a bulletin some 8 months prior in the plant to the effect this door might be used did not make it a usual entrance or exit. There is no showing in the evidence that any check-in arrangement for the employees had ever been established at this gate nor that it had ever been used as a normal entrance or exit prior to this strike. Even had these facts been shown, it is apparent from the over-all evidence that there was proof of reasonable fear of violence or bodily injury in attempting to enter this gate by the number of pickets present, the distance over open ground from the street to reach the door, the threats and acts of bodily violence at the other gates, and the incident on November 29 at Gate 6 at which the truck was obstructed and its driver threatened, which latter event was alleged in the injunction complaint. We hold that there is no merit to the Company's contentions as to Gate 6.

In view of the evidence, including the many admissions thereto of the Company, the manifest weight of the evidence supports the findings and order of the Director of Labor as affirmed by the circuit court that from November 2, 1960, to November 30, 1960, the claimants who were Selco Union employees were prevented from entering the plant by a reasonable fear of bodily harm and thus did not participate in the labor dispute causing the stoppage of work and for such period they are entitled to unemployment compensation.

As has been recited earlier in this opinion, the evidence shows orderly picketing in compliance with the injunction order from November 30, 1960, to December 10, 1960, when the strike ended. While members of the striking Union were parked in some car or cars along the streets, and some were in huts near the picket posts, no violence, or incidents of threat of violence, appears to have occurred after November 30, 1960. The evidence showed that only

some three Selco Union workers entered the plant after November 30, and no testimony shows any effort to enter made by any other Selco workers. In this state of the evidence, we find the manifest weight of the evidence supports the findings and order of the Director of Labor as affirmed by the circuit court that from November 30, 1960, until December 10, 1960, the members of Selco Union participated in the labor dispute which caused the stoppage of work, since the issuance of the injunction reduced the number of pickets and made it possible for them to enter the plant without reasonable fear of bodily harm, and their unemployment for such period was due to their failure to take advantage of the opportunity afforded them.

It is contended by the Company that the Director of Labor in holding Selco Union employees entitled to benefits from November 2 to November 30, 1960, relied on the fact that the employer had a duty to provide police protection for nonstriking employees and that this was contrary to law. We do not so interpret the remarks of the Director. Assuredly, Sangamo was under no duty to furnish police protection. Their failure to do so in no way justified the conduct of the pickets or affects the finding that Selco employees were in reasonable fear of violence and bodily harm in attempting to enter the plant from November 2 to November 30.

The Maintenance Unit employee claimants contend they were laid off; that there was no work available for them; and that they were not participating in the strike in any way. The evidence showed that the Maintenance Unit workers belong to the same local Union as the striking tool and die workers; however, each was in a separate bargaining unit and each had a separate labor contract with the Company. At the time of the strike by the tool and die makers, the contract of the maintenance workers had another year to run. The maintenance workers could not hope to benefit from the strike and had no direct interest in the strike. The evidence

showed that on the night of November 1, when the strike started, John Patton, the Company's industrial relations manager, and John Drennan, the representative of the striking Union (as well as the representative of the Maintenance Unit) agreed that some 20 persons, of whom all but four were machinists, might be allowed to pass through the picket lines for skeleton factory maintenance. This included a carpenter, an electrician and a millwright for each of 3 shifts. This personnel was to be permitted to pass the picket lines only for protection of the Company equipment. However, Drennan further represented that all maintenance workers needed by the Company would be permitted through the picket lines. A list of names of these 20 persons was agreed upon. There is a dispute in the evidence whether the plant manager told Drennan that the rest of the Maintenance Unit was laid off. It appears that it simply was understood by Patton for the Company and Drennan for the striking Union that only those persons would be permitted to pass the picket lines who were needed for skeleton maintenance. The testimony of Patton was that there was sufficient maintenance work to be done to keep the entire Maintenance Unit employees working. On November 2, 1960, the Company sent a letter to all employees that their work was open and available.

There is no showing in the record of any attempt by any claimant Maintenance Unit employees to go to work or to cross the picket lines. Thus, there is no reason to believe that the members of their own Union would have caused bodily violence to these employees. There is no showing that these claimants ever protested the strike. There is no showing that these claimants ever requested or received permission from the striking Union to be released from the strike or from participating in it. In the absence of proof on these matters and with the evidence showing certain of their members freely passing through the picket line by agreement, it is our opinion that the evidence shows

that the claimants who are members of the Maintenance Unit participated in the labor dispute by "respecting" the picket line of the Tool and Die members or were members of a grade or class of workers some of whom participated in the labor dispute by respecting such picket lines. The manifest weight of the evidence supports the findings and order of the Director of Labor on this matter also, and the circuit court was correct in also affirming this portion of the order.

The appellant, Sangamo Electric Company, took the position that because a portion of the monthly union dues paid by the Maintenance Unit employees were used by the Grand Lodge to pay strike benefits, these employees were financing the labor dispute. The strike benefits of $35 per week paid to each Tool and Die Unit employee were paid directly by the Grand Lodge, and the Maintenance Unit employees did not, through the local or directly, finance the strikers. The Director held that in this situation the maintenance workers did not finance the labor dispute within the meaning of the statute. However, in view of his holding and our approval that these workers were prevented from recovering unemployment compensation because of their participation in the labor dispute it is unnecessary for us to consider this question.

The judgment of the circuit court of Sangamon County confirming the decision of the Director of Labor is affirmed.

*Judgment affirmed.*