RICHARD BERRY, d/b/a BERCO & ASSOCIATES, Plaintiff-Appellee, *v.* BLACK-ARD CONSTRUCTION CO. *et al.,* Defendants-Appellants—(FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF PEORIA *et al.,* Defendants.)

BLACKARD CONSTRUCTION CO., Plaintiff-Appellant, *v.* RICHARD BERRY, d/b/a BERCO & ASSOCIATES, *et al.,* Defendants-Appellees.

(No. 11951; <span style="background:black">        </span>

Fourth District—August 9, 1973.

*Rehearing denied September 12, 1973.*

Wayne E. Armstrong and Jon D. Robinson, of Hull, Armstrong & Campbell, of Decatur, for appellants.

Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, (Thomas S. Sly and John S. Cobb, of counsel,) for appellees.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

This is an appeal from two judgments entered in two cases which were consolidated in trial court, and in which the issues were tried without a jury.

On November 6, 1969, appellant Blackard Construction Co. filed suit against appellee Richard Berry, d/b/a Berco & Associates and Great American Insurance Company (Berry's surety) alleging that Berry had breached a contract for the construction of certain facilities in Camelot Addition and sought damages for repairs of Berry's faulty work, the cost of completion of the work following Berry's refusal to proceed with the job, and consequential damages. As to this suit the trial judge found Blackard Construction Co. guilty of anticipatory breach of the contract and entered judgment in favor of Berry.

On February 13, 1970, the appellee Richard Berry, d/b/a Berco & Associates sued the appellant Blackard Construction Co., Richard Blackard, Yvonne Blackard and others having interests in Camelot Addition, a subdivision in Decatur, Illinois. Berry alleged breach of contract and sought to enforce his rights under the Mechanic's Lien statute. The trial judge found in Berry's favor and awarded him a mechanic's lien in the sum of $20,940.64.

Richard D. Blackard, during the period of time in question, was the sole stockholder and President of Blackard Construction Company. He and his wife Yvonne Blackard originally purchased the land which became Camelot Addition. On June 2, 1969, Blackard and his wife entered into an agreement with Blackard Construction Company providing that all work on Camelot Addition (including the work to be performed by appellee Berry) would be completed by February 1, 1970. Blackard Company was to develop the subdivision, supervise the installation of all improvements and was granted the option to purchase the improved lots and to promote sales. On June 16, 1969, Blackard Company and Berry entered into a contract pursuant to which Berry was to construct sanitary sewers, storm drainage, water mains and alternate streets for the Camelot Addition. The first paragraph of the agreement incorporated, by reference, Standard Specifications for Water and Sewer Main Construction in Illinois, first edition, August 1, 1967, a publication by the Illinois Society of Professional Engineers and other related groups interested in the titled subject. The book contains 152 pages. The contract further provided that "The work * * * shall be completed in 180 work days. * * * Work days shall be determined by the Engineer." Other pertinent paragraphs provided as follows:

> "4. PROGRESS PAYMENT. BLACKARD shall make payment on account of the contract as provided therein as follows:
>> On or about the 15th day of each month, an amount equal to 90% of the value, based upon the contract price of labor and materials, incorporated in the work up to the last day of the

preceding month, as certified to by Warren E. Hagan, as engineer, less the aggregate of previous payments.

5. ACCEPTANCE AND FINAL PAYMENT. Final payment shall be due thirty days after substantial completion of the work, provided the work be then fully completed and the contract fully performed.

Upon receipt of written notice that the work is ready for final inspection and acceptance, the Engineer shall promptly make such inspection and when he finds the work acceptable under the contract and the contract fully performed, he shall promptly issue a final certificate under his own signature, stating that the work provided for in this contract has been completed and is accepted by him under the terms and conditions thereof, and that the entire balance found to be due BERCO, and noted in said final certificate, is due and payable.

Before issuance of final payment BERCO shall submit evidence satisfactory to Warren E. Hagan, Engineer, that all payrolls, material bills, and other indebtedness connected with the work have been paid or otherwise satisfied."

Berry was to commence work by June 23, 1969. He was paid, pursuant to the above-recited paragraph 4 of the contract, a progress payment of $6,470.28 for work completed through July 1, 1969; he received a progress payment of $16,661.46 for work completed, from July 1, 1969, to August 1, 1969, and a third progress payment in the amount of $37,855.05 for work completed from August 1, 1969, to September 1, 1969. Warren Hagan, engineer for Blackard testified, with reference to the progress payments as follows:

"Q. In connection with this contract, did you on a monthly basis prepare what was called an Engineer's Payment Estimate?

HAGAN: Yes.

J. And what was meant to be covered by the estimates on a monthly basis?

HAGAN: The estimates were to cover all of the work installed in the project.

Q. Did those estimates reflect whether or not the work was installed in accordance with the contract?

HAGAN: No, they did not.'"

Hagan then prepared a fourth progress payment report for Blackard which indicated payment due Berry in the amount of $35,756.13. This fourth progress payment report encompassed some 320 lineal feet of 12 inch sewer pipe. Hagan testified, with reference to this report as follows:

"Q. Am I correct in assuming that at the time you prepared this it was your best judgment, without having actually measured, that there was 320 lineal feet of the 12 inch sewer pipe installed on the ground?

Hagan: Approximately 320 feet, yes.

Q. And by showing it there you did not mean to state to anyone that it had been completed in the sense that it had been tested and accepted by the city, did you?

A. That it had been tested or accepted by our office or the city.

Q. That it was simply installed in the ground?

A. Simply in place."

Blackard then refused to pay the $35,756.13 shown to be due Berry according to the fourth progress payment report, advising Berry on October 7, 1969, that "* * * Payments are to be made on work in place and accepted. The sewer is not acceptable. Therefore, payment for sewer work in place and not accepted will not be made." On October 22, Blackard advised Berry that he had ten days in which to correct defects in the sewer line. Berry did no further work on the job after October 17, 1969, stating that his only reason was Blackard's refusal to pay the $35,756.13. Thereafter, on November 3, 1969, Blackard declared the contract forfeited, took over the project and completed it.

Blackard first urges that the trial court erred in finding that it breached the contract by "anticipatory repudiation in view of the express terms of the contract." It is undisputed that in October, 1969, some of the work in place was not in a condition to be finally acceptable.

The resolution of this assignment of error hinges upon the construction of the contract between Berry and Blackard Construction Co. In essence the trial judge interpreted the above-quoted paragraphs 4 and 5 of the contract to mean that Berry had 180 working days to complete the project with all work finally acceptable under the plans and specifications, and that he was entitled, each month, to receive (upon the basis of the engineer's progress payment report) a sum equal to 90% of the value of labor and materials incorporated in the work during the period covered by the report, and that Berry had 180 days within which to make the work finally acceptable. It is clear that this is precisely what the contract says absent reference to the 152-page treatise incorporated by reference as above recited. The trial judge made extensive and detailed findings of fact and conclusions of law. A portion of those findings are as follows:

6. (the contract "* * * provides, inter alia, for 180 working days for the completion of the work and for progress pay-

ments monthly of 90% of the value of labor and materials incorporated in the job during the preceding month as certified to by the engineer on the project."

7. "That * * * Berry completed 71 working days * * *".

* * *

13. "That the payment estimate number 4 aforesaid of $35,756.13 was never paid * * *".

* * *

20. "That Blackard * * * declared the contract forfeited on November 3, 1969, and took over the project at that time."

* * *

24. "That Blackard's action was taken after only 71 of 180 working days called for in the contract had elapsed and Blackard is guilty of an anticipatory breach of the contract".

25. "That Blackard's actions of non-payment and forfeiture effectively prevented Berry from making repairs to work already installed, if any be needed, and from completing his contract".

26. "That there is no substantial and credible evidence in the record that Berry could not have completed his contract in an acceptable manner within the aforesaid 180 days".

■■ It is apparent that finding of fact No. 6 is, despite the label, the trial judge's construction of the contract between the parties. The fact that a finding by the trial court is designated a finding of fact does not preclude review of that finding as a question of law if it actually is. (*Illinois Bell Telephone Company v. Slattery* (1939), 102 F.2d 58.) Where there is a written contract and extrinsic facts are free from dispute, construction of the contract is a question of law, not fact. (*Rosenbaum Bros. v. Devine*, 271 Ill. 354, 111 N.E. 97.) Where all the parties adopt and act on a certain construction of a contract, there is not better extrinsic evidence of their intention than the interpretation they themselves placed upon it. (*American National Bank and Trust Company v. Lembessis*, 116 Ill.App.2d 5, 253 N.E.2d 126.) The record here indicates that Hagan and Blackard were aware that some of the work in place did not conform to final acceptable standards prior to Berry's receipt of progress payments made to him on the basis of the engineer's estimates number 2 and 3, and, indeed, that Hagan made no effort to ascertain "final acceptability" as to the work in place when those estimates were made nor did Blackard demand that he do so. Hagan also made no determination of "final acceptability" in preparing progress estimate No. 4. The parties had, in fact, construed the contract precisely as the trial court did prior to Blackard's letter of October 7, 1969, and the trial court's construction of paragraphs 4 and 5 of the contract is predicated

upon the proposition that those paragraphs are couched in plain, unambiguous language and simply mean what they say. This approach to an effort to divine the meaning of language employed in a contract is to be commended.

Blackard argues that reference to the Standard Specifications For Water and Sewer Main Construction in Illinois supports the position that progress payments are not to be made until the work meets final acceptability standards. We note that this volume contains detailed specifications concerning materials, mechanical preparation and methods of installing water and sewer mains. The contract between Blackard and Berry provided, with reference to the incorporation of the Standards, as follows:

> "1. Scope of Work. Berco shall furnish all of the materials and perform all of the work as described in Section 1—Sanitary Sewers, Section 2—Storm Drainage, Section 3—Watermains, and Section 5—Alternate Streets and shown on the plans for "Camelot" prepared by Warren E. Hagan * * * and shall do everything required by this agreement and the specifications prepared by * * * Hagan for this project, all to be done in accordance with the Standard Specifications for Water and Sewer Main Construction in Illinois * * *."

Blackard argues that sections 5—10, 7—18, and 8—11 of the Standards are part of his contract with Berry and are designed to protect the owner in the event that the work does not comply with the specifications. It would unduly lengthen this opinion to quote these in detail. We agree that the provisions were inserted for the protection of the owner, but it is equally clear that none of them have any bearing upon the conditions for progress payments set forth in paragraph 4 of the contract. The trial court's interpretation of paragraph 4 of the contract to the effect that it means precisely what it says is correct, and we agree that it is unambiguous and not susceptible of a different "interpretation". Berry was entitled to receive the $35,756.13 progress payment No. 4 as certified to by Hagan and Blackard did breach the contract by refusing to make that payment.

■■ Blackard next contends that the trial court "erred in granting Berry a Mechanic's Lien in view of Berry's breach of contract". The trial court ruled that Blackard, not Berry, breached the contract. We have agreed with that ruling.

Blackard's final contention is that the trial court erred in granting to Berry a mechanic's lien for an amount which exceeds the "value" of his work. In substance the argument is that the trial judge's finding, as to the amount of lien awarded, is against the manifest weight of the evidence.

The findings of fact conclusions of law made with reference to the lien awarded are as follows:

"33. That the Court calculates Berry's lien, based upon the evidence submitted, including the exhibits, and matters admitted in the pleadings, and certain stipulations made, as follows:

| | |
|---|---|
| Balance due on Estimate No. 4 | $35,756.13 |
| Extra (mainly street grading) | 2,440.03 |
| Retainage—Estimate No. 4 | 10,749.21 |
| Work in place not on Estimate No. 4 | 6,620.24 |
| Materials left on site | 2,918.71 |
| Crushed stone | 1,325.30 |
| | $59,890.72 |

| *Deductions:* | |
|---|---|
| Paid to suppliers | $12,407.77 |
| Repairs to sewer in place | 18,852.46 |
| Repairs to water mains | 814.72 |
| Repairs to curbing | 270.00 |
| Engineering at 15% | 2,990.58 |
| | $35,335.53 |
| Overhead at 10% | 3,533.55 |
| | $38,869.08 |
| Lien Total | $20,940.64 |

### CONCLUSIONS OF LAW

1. That Berry is entitled to a Mechanic's Lien on the premises in the amount of $20,940.64 and costs of suit."

Blackard's argument as to the amount of lien is, in essence, directed to the cost of repairs which it says must be made to a sewer line which contains three areas of sag. The line in question is operating. The trial judge expressly found, with reference to the issue of repairs to sewer line in place that:

"31. That the evidence concerning repair of the sewer work in place, the value of material left on the premises by Berry and used by Blackard, and the amount of crushed stone left on the premises is so conflicting as to be almost impossible to determine.

32. That with the exception of Glenn Chastain the Court had

no benefit of independent testimony and the testimony of Chastain is vague and uncertain."

■■ The evidence as to necessity of repair, extent of repairs and costs of repairs is, as the trial judge found, vague, uncertain and in sharp conflict. It is not the function of this Court to reweigh and reevaluate that evidence. (*Landolt v. Stratmann*, 87 Ill.App.2d 81, 230 N.E.2d 498.) The judgment of the trial court in assessing damages is not against the manifest weight of the evidence.

Judgment affirmed.

SMITH, P. J., and TRAPP, J., concur.