36 Ill. App.3d 998 (1976)
345 N.E.2d 143
CENTRAL FOUNDRY DIVISION OF GENERAL MOTORS CORPORATION, Plaintiff-Appellant,
v.
KENNETH W. HOLLAND, Director, Department of Labor, et al., Defendants-Appellees.
No. 13138.
Illinois Appellate Court  Fourth District.
Opinion filed March 25, 1976.
Ellis A. Ballard, Thomas D. Nyhan, and John B. Lashbrook, all of Pope, Ballard, Shepard & Fowle, of Chicago (Frazer F. Hilder, General Counsel, and Larry L. Lessen, of Sebat, Swanson, Banks, Lessen & Garman, of counsel), for appellant.
Harold A. Katz and Michael B. Erp, both of Katz & Friedman, of Chicago, for appellees United Automobile, Aerospace and Agricultural Implement Workers of America, and its Local No. 579, and the Individual Employee Claimants.
William J. Scott, Attorney General, of Chicago (John D. Whitenack, Assistant Attorney General, of counsel), for appellee Kenneth W. Holland.
Judgment affirmed.
Mr. JUSTICE CRAVEN delivered the opinion of the court:
This appeal is by plaintiff Central Foundry Division of General Motors Corporation (Central Foundry) from a judgment of the circuit court of *999 Vermilion County affirming a decision of the Illinois Department of Labor that defendants-claimants were not ineligible for unemployment benefits. The Department and the trial court found that the unemployment of defendants-claimants was not due to a stoppage of work existing because of a labor dispute at the Central Foundry premises in Danville, Illinois. The sole issue on review is whether that finding is contrary to the manifest weight of the evidence. We judge it is not and affirm.
All of the claimants are employed at the Central Foundry plant, which is a geographically separate foundry unit of General Motors (GM) and is the only GM plant in Danville, Illinois. Central Foundry is a supplier of automobile and truck parts, producing gray iron metal castings (engine parts, transmission parts, axle parts, etc.) primarily for GM cars and trucks (about 80 percent of Central Foundry's business), but also for GM's competitors (about 20 percent of Central Foundry's business). Central Foundry is a wholly owned division of GM, but is not a "captive" foundry. It receives no orders from other GM plants solely as a consequence of its status as a GM division. It competes for work and customers as though it were wholly independent of GM. All hiring is done locally and seniority is not accorded to other GM employees transferring to Danville. All purchases of materials necessary to operate Central Foundry are initiated locally. All bills of lading are prepared in Danville. All shipments are made directly to its customers from Danville. Central Foundry treats all of its customers alike, which includes GM and GM's competitors. Central Foundry grants no price reductions to GM and receives no subsidies from GM.
Claimants are members of the United Auto Workers, Local Union No. 579, which is an affiliate of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (International Union). Two collective bargaining agreements govern the working conditions at Central Foundry. A national labor agreement covers all 400,000 GM employees. It is bargained in Detroit through negotiations between the International Union and GM. In addition, local agreements exist between the local unions and the GM divisions; these contracts come up for renegotiation at the same time as the overall national agreement, and are bargained locally at the various GM plants involved. The national and local agreements governing claimants were due to expire at 11:59 p.m., December 14, 1970. Notices of termination of the contract between GM and the unions were exchanged, setting an effective expiration date of September 14, 1970. Negotiations at the national level, at which claimants were represented through the International Union's sub-council No. 5, commenced July 15, 1970. Negotiations between Central Foundry and Local No. 579 commenced July 20, 1970.
*1000 In August 1970, the International Union informed GM that if no agreement was reached, a "selective strike" would be directed against GM. A selective strike is a collective bargaining strategy employed by the International Union. Only the strike target is shut down. Competing companies are deliberately not struck, but rather are kept in business in order to maximize economic pressure on the target company. The International Union starts with the contracts at Ford, Chrysler, and GM, which all come up for negotiation on the same date. Bargaining for new contracts commences with simultaneous negotiations with these three companies separately. If agreement is not reached, the International Union designates one of the three as a strike target, and then a strike is called against that company. Bargaining then proceeds to a conclusion with that company, while negotiations with the other two are held in abeyance. The contract ultimately reached with the target company is then used as a pattern for agreements with the other companies. When GM is the strike target, the selective strike strategy requires that certain GM plants are not struck. The reason is that GM is a major supplier of certain parts to Ford, Chrysler, and American Motors. These companies would have to shut down if GM stopped delivering their parts. Therefore, any division of GM (such as Central Foundry) which supplies parts to Ford, Chrysler, or American Motors continues in operation. Those divisions shut down as orders drop off from the struck GM plants.
Following the commencement of the national strike, the regular 19 1/2 percent of Central Foundry's production for customers such as Ford, Chrysler, and American Motors continued. Production for usage in GM cars and trucks was virtually halted as a result of the stop orders issued by the other GM divisions to which Central Foundry normally ships. As production was curtailed, employees were sent home. While the contract negotiations continued, 1181 out of a total of 2017 Central Foundry workers became unemployed. In addition, approximately 45 workers previously laid off continued to await recall.
During the negotiations, none of the members of Local No. 579 refused to work at Central Foundry. No picketing occurred at the plant. A formal operating policy during the no-contract period was established by management and presented to claimants. The existing local grievance policy and pension plan was continued. The wage rates which prevailed before termination of the old contract were maintained. The company's decision was to continue operations at Danville to the extent that business warranted. Local No. 579 encouraged its members to work during this period. No harassment in any form took place. During this time, claimants who were sent home from work obtained advances from the union, subject to the obligation to repay if and when they received unemployment compensation. *1001 The amounts advanced were the same amounts as the strike benefits paid by the International Union to its members on strike at other GM plants.
An agreement between Central Foundry and Local No. 579 was ratified November 16, 1970. The International Union and GM reached an agreement which became effective November 23, 1970. The national contract provided increased wages and benefits for all union members, including claimants. Because of unresolved local issues at other GM plants, full production at Central Foundry was delayed until December 12, 1970. On October 13, 1970, a claims adjuster for the Illinois Department of Labor determined that claimants were not ineligible for unemployment compensation. After a de novo hearing before a representative of the Illinois Director of Labor, the following findings of fact were made:
"1. There was a curtailment of production at the Central Foundry in Danville, Illinois, during the period from September 15, 1970, to December 12, 1970.
2. The aforesaid curtailment of production was not due to a labor dispute existing at the aforesaid premises during the period from September 15, 1970, to December 12, 1970.
3. The aforesaid curtailment of production was due to a labor dispute between the International U.A.W. and certain General Motors plants which were geographically isolated from the Central Foundry at Danville, Illinois.
4. The unemployment of the claimants herein was not due to a stoppage of work which existed because of a labor dispute at the establishment at which each was last employed during the appropriate periods from September 15, 1970, to December 12, 1970."
On administrative review, the trial court affirmed the decision of the Department of Labor as being supported by the manifest weight of the evidence, specifically finding:
"(c) The unemployment of the defendant-claimants was not due to a stoppage of work existing because of a labor dispute at the premises of the plaintiff at Danville, Illinois."
The crux of this appeal is whether the work stoppage and resulting unemployment at Central Foundry were the result of a labor dispute at Central Foundry. Claimants' position is that, given that Central Foundry was maintained in operation as part of a national strike strategy, any labor dispute existing at Central Foundry did not cause the work stoppage and resulting unemployment; and that the unemployment was the result of a curtailment in production caused by the labor dispute between the International Union and certain GM plants geographically isolated from Central Foundry, which caused a stop in purchase orders. Central Foundry's *1002 positions is that the situation at Central Foundry was a part of the labor dispute between GM and the International Union, and that therefore the labor dispute which caused the work stoppage and unemployment was at Central Foundry. Both parties agree that the local contract negotiations are irrelevant to this appeal.
Section 604 of the Unemployment Compensation Act provides:
"An individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed * * *." (Ill. Rev. Stat. 1969, ch. 48, par. 434.)
The legislative purpose underlying section 604 was stated in Buchholz v. Cummins, 6 Ill.2d 382, 128 N.E.2d 900:
"The general purpose of the Illinois Act, as expressed in section 1, is to relieve involuntary unemployment. However, section 7(d) specifically disqualifies any individual for benefits for any week in which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the establishment at which he is or was last employed. By this provision the Illinois legislature adopted the policy that the State shall not, by payment of unemployment compensation, assist one party to a labor dispute, regardless of fault; and that the State in cases of industrial strife ought not take sides and place blame." 6 Ill.2d 382, 386, 128 N.E.2d 900, 902-903.
Section 604 bases ineligibility on three factors: (1) There must be a work stoppage; (2) there must be a labor dispute; and (3) proximate causation must be found between the work stoppage and the labor dispute at claimant's factory, establishment, or other premises.
Work Stoppage. Stoppage of work refers "to a stoppage of work of the plant or particular department of a plant and not to the individual unemployment of the worker or workers." (Abbott Publishing v. Annunzio, 414 Ill. 559, 569, 112 N.E.2d 101, 106.) The Department of Labor's finding that a curtailment of production began September 15, 1970, and ended with the resumption of normal production December 12, 1970, is supported by the record. A work stoppage thus existed during that period. See Be-Mac Transport Co. v. Grabiec, 20 Ill. App.3d 345, 314 N.E.2d 242. See Be-Mac Transport Co. v. Grabiec, 20 Ill. App.3d 345, 314 N.E.2d 242.
Labor Dispute. During the relevant period, national negotiations were being conducted between GM and the International Union, which represented claimants. The negotiations involved wages, hours and other conditions of employment. The term "labor dispute" within the meaning of section 604 has been defined by decision as "any controversy concerning wages, hours, working conditions or terms of employment." (Buchholz, 6 Ill.2d 382, *1003 387, 128 N.E.2d 900, 903; Local Union No. 11 v. Gordon, 396 Ill. 293, 299, 71 N.E.2d 637, 640.) Where, as in the instant case, a contract has expired, both the Union and the employer have submitted demands concerning wages and conditions of employment, and these demands have been neither accepted nor compromised, a labor dispute exists. See Buchholz, 6 Ill.2d 382, 388-89, 128 N.E.2d 900, 904.
Causation. A finding with regard to the causal connection between a claimant's unemployment and a labor dispute is a finding of fact. (BeMac, 20 Ill. App.3d 345, 355, 314 N.E.2d 242, 250.) The scope of a review court's inquiry into the cause of claimant's unemployment is thus restricted to "ascertaining if the agency decision was contrary to the manifest weight of the evidence." Be-Mac; see Davern v. Civil Service Com., 47 Ill.2d 469, 269 N.E.2d 713; Sangamo Electric Co. v. Donnelly, 26 Ill.2d 348, 186 N.E.2d 230.
In Walgreen v. Murphy, 386 Ill. 32, 53 N.E.2d 390, the court rejected the doctrine of "functional integration" and instead established a geographic isolation rule to determine the boundaries of the "factory, establishment, or other premises" for the purpose of "ascertaining whether a stoppage of work due to a labor dispute exists." 386 Ill. 32, 39, 53 N.E.2d 390, 394.) The record discloses that Central Foundry is a geographically isolated operation, separate and distinct from any other GM subsidiaries. Hence, we apply a geographic isolation test to determine whether the stoppage of work at Central Foundry was caused by a labor dispute at the Central Foundry premises. Under this analysis, the presence or absence of a labor dispute at other GM plants is of no legal significance.
The record reveals no strike at Danville. On the day on which the labor strike began, all shifts reported to work at Central Foundry. No employee at Central Foundry ever declined to work during the September-November 1970 period. There was never any picketing. Nothing was done to discourage any subcontractor from carrying out any work at the Central Foundry. Local No. 579 encouraged its members to work during this period. The leaders of Local No. 579 assisted in the continuation of production. There was no harassment in any form. A formal operating policy existed during the strike period. The existing local grievance policy, pension plan and wage rates were continued during the national strike. Central Foundry continued to ship to the GM Frigidaire division and to other GM plants to the extent that they would accept shipments. During the strike, Central Foundry employees continued to work on material which was destined for plants which had been struck. Production of material for Ford, Chrysler, and American Motors was increased during the strike. Central Foundry's personnel director stated that the intention of Central Foundry was to continue operations at Danville during the period in question to the extent that business warranted it. He *1004 stated that the workers were sent home "as their jobs went down." Production was curtailed only after Central Foundry was notified by its customers not to fill their respective orders. The record clearly supports the finding of the Department of Labor that the curtailment of production was not due to a labor dispute existing at the Central Foundry premises.
The record clearly establishes that the striking GM plants were unable to accept the castings which they had ordered from Central Foundry. Central Foundry lacked storage space and was therefore unable to continue manufacturing these products. Thus, the record supports the correlative finding that the curtailment of production was due to a labor dispute between the International Union and certain GM plants geographically isolated from Central Foundry.
The law is well established that "the Unemployment Compensation Act must be liberally construed so as to provide sustenance to those who are unemployed through no fault of their own and who are willing, anxious, and ready to work if given the opportunity." (Shell Oil Co. v. Cummins, 7 Ill.2d 329, 339, 131 N.E.2d 64, 69.) Claimants were able, available and willing to work, and their unemployment was the involuntary result of conditions elsewhere. There is substantial evidence in the record supporting the findings of the Department of Labor, and those findings are not contrary to the manifest weight of the evidence.
We feel compelled to note and comment upon the inordinate amount of time consumed in the administrative review and judicial process evidenced by this record. This opinion is written in March 1976 to determine eligibility for unemployment compensation of the claimants in September, October and November of 1970. A brief recitation of the pertinent chronology indicates as follows:
September 15, 1970 to November 1970 = Period of layoff
October 1970 = Claims adjuster files his determination
October 1970 = Central Foundry appeals administratively
January 1973 = A report of a representative of the Department of Labor is sent to the parties
January 1973 = Objections to report by GM
February 1973 = Director of Labor affirms the report
March 1973 = Petition for administrative review filed in the trial court
January 1975 = Order of trial court affirming Department of Labor
January 1975 = Notice of appeal filed
May 1975 = Brief of appellant filed

*1005 September, October 1975 = Appellees' briefs filed
December 1975 = Oral argument in the appellate court
March 1976 = Opinion of the appellate court
The issue of eligibility for unemployment compensation by its very nature should be expeditiously determined. In this case, clearly it was not. The substantive effect of such inordinate delay can result in a denial of justice by the mere fact of delay. We make this observation not for the purpose of assessing fault but for the purpose of commending to all the elimination of such inexcusable delay. (See Doyle v. Board of Review, Department of Labor, 31 Ill. App.3d 968, 334 N.E.2d 776; Frisch v. International Harvester Co., 33 Ill. App.3d 507, 338 N.E.2d 90.) The judgment of the circuit court of Vermilion County is affirmed.
Judgment affirmed.
SIMKINS, J., concurs.
Mr. PRESIDING JUSTICE TRAPP, specially concurring:
I concur in the disposition of the legal issues presented. The quality of the administrative procedures of the executive department is not an issue in this case.
In People ex rel. Billings v. Bissell, 19 Ill. 229, 230-31, it is said:
"To the judiciary is confided the power and the duty of interpreting the laws and the constitution whenever they are judicially presented for consideration. Hence it becomes our duty to determine what is the meaning of the laws passed by the legislature, and, also, whether those laws are such as the legislature was authorized by the constitution to pass. So, also, of the acts of the executive; we are bound to determine whether such acts are authorized by the laws and the constitution, whenever they are brought before us judicially, but not otherwise. * * * In no other way, nor in any other case, can this department construe the constitution for, or exercise any control over, any other department. Where final action upon any subject is confided to either of the other departments, there the responsibility must rest, of conforming such action to the law and the constitution."
Accordingly, I do not join in the comment concerning the conclusion of administrative delay.