O. DUNAWAY et al., Plaintiffs-Appellees, v. THE DEPARTMENT OF LABOR, BUREAU OF EMPLOYMENT SECURITY, DIVISION OF UNEMPLOYMENT INSURANCE, et al., Defendants-Appellants.

Fifth District   No. 81—267

Opinion filed August 25, 1982.—Rehearing denied September 21, 1982.

HARRISON, J., dissenting.

Glen H. Kanwit, of Chicago, and Charles R. Jelliffe, of Jelliffe and Ferrell, of Harrisburg, for appellant Sahara Coal Company, Inc.

Tyrone C. Fahner, Attorney General, of Springfield (Rosalyn B. Kaplan, Assistant Attorney General, of counsel), for appellant Department of Labor.

J. E. Wenzel and Verticchio & Verticchio, both of Gillespie, and G. William Horsley, of Springfield, for appellees.

JUSTICE KASSERMAN delivered the opinion of the court:

The instant appeal arises out of the decision of the circuit court of Saline County in an administrative review proceeding. The general issue is whether the claimants, who are employees of defendant Sahara Coal Company (Sahara) and members of the Progressive Mine Workers of America (PMWA), are disqualified from receiving unemployment insurance benefits under section 604 of the Illinois Unemployment Insurance Act (Ill. Rev. Stat. 1979, ch. 48, par. 434) (hereinafter referred to as the Act). Claimants were denied benefits for a period of time during which they refused to cross United Mine Workers of America (UMWA) picket lines at Sahara's strip mine, repair shop, and two underground mines.

Section 604 provides in pertinent part as follows:

"Labor dispute. An individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed. *** This Section shall not apply if it is shown that (A) the individual is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (B) he does not belong to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that a lockout by the employer or an individual's failure to cross a picket line at such factory, establishment, or other premises shall not, in itself, be deemed to be participation by him in the labor dispute." Ill. Rev. Stat. 1979, ch. 48, par. 434.

Although Sahara employs no UMWA members, a total stoppage of production was effected from December 6, 1977, through March 6, 1978, except as hereinafter noted. An Illinois Department of Labor claims adjudicator determined that plaintiffs were eligible for benefits; however, upon Sahara's appeal to the Labor Disputes Unit of the Division of Unemployment Insurance, the representative of the Illinois Director of Labor recommended that claimants be held ineligible under section 604. The representative of the Illinois Department of Labor based his recommendation upon his conclusion that the contract between PMWA and the Coal Producers' Association of Illinois (CPAI), of which Sahara is a member, gave claimants a "direct financial interest" in the UMWA dispute regardless of the fact that UMWA's dispute was with the Bituminous Coal Operators' Association (BCOA), of which Sahara is not a member. The Director of Labor adopted the representative's recommendation. Claimants sought administrative review in the circuit court of Saline County. No new evidence was adduced before that court; the circuit court reversed, determining that plaintiffs were not "directly interested' in the UMWA-BCOA dispute. Sahara and the Department of Labor have perfected the instant appeal.

At the outset we note that section 604 of the Act makes an employee ineligible for benefits for any week in which it is found that his unemployment is due to a work stoppage which exists because of a "labor dispute at the *** premises at which he is or was last em-

ployed" unless the two specified exceptions are found to exist. Although it may be argued under this provision that claimants may not be deprived of benefits because no labor dispute existed at the premises where they worked, the parties have not relied upon such an interpretation of the Act. Consequently, we shall not consider such interpretation of the Act.

Testimony at the hearing before the Director's representative was in pertinent part as follows: Walter Lucas, vice-president of Sahara, testified that UMWA members started picketing on December 6, 1977, at all four Sahara facilities. Lucas testified that he was aware of no acts of violence at any of Sahara's four facilities during the UMWA strike although he had read newspaper accounts of strike-related threats and violence at other locations. Several such newspaper articles were admitted in evidence at the hearing. Lucas testified that when the picketing began, he instituted security procedures, including security patrols and surveillance and identification of pickets and their vehicles. According to Lucas, all four Sahara facilities were marked "to work," as opposed to "idle," throughout most of the period during which the facilities were picketed. However, the mines were marked idle between December 27, 1977, and January 2, 1978, which Lucas described as "our normal shut down period." According to Lucas, under the PMWA-CPAI contract, qualifying PMWA members were paid during this shutdown period if they worked the day before it and the day afterward. Lucas testified that no pickets were present the day before or the day after the shutdown period and that an unspecified number of Sahara employees did in fact work on these two days. Lucas testified that picketing by the UMWA Construction local stopped work on March 26 and 27, 1978.

Several PMWA members employed at Sahara also testified at the hearing. Their testimony indicated that most of them did not work on December 6, 1977, the first day of picketing. One employee mentioned seeing a picket swinging a "tire thumper," the only testimony concerning what might be considered a weapon. Some employees stated that they were asked not to work. None testified to being threatened on December 6; however, one employee, who worked on December 8 because he had seen no pickets, came home to discover that his family has been threatened by telephone. Two other employees testified concerning similar threats. One Sahara employee testified that when he first returned to work in March, he was assigned to patrol the belt line because "the mine had received phone calls." Several pickets were described as being intoxicated. There was testimony that the employees returned to work on the day following President Carter's

March 6, 1978, announcement that he was ordering the miners back to work under the Taft-Hartley Act. UMWA pickets were removed from the four Sahara facilities beginning March 7, 1978. A settlement between UMWA and BCOA ending the strike was reached March 27, 1978.

Included in the PMWA-CPAI contract in effect at the time of the UMWA strike was a "most favored nations" clause which provided:

> "During the term of this contract should any competitive field make a contract covering wages or working conditions more favorable to either the Association or the Union ***, then this contract shall be modified so that both sides may receive all the benefits of such more favorable contract ***."

Mr. Lucas testified that there was considerable difference between UMWA and PMWA wage scales under their respective contracts, the PMWA receiving the higher wages. He testified that in the two unions' most recent contracts each had received the same pay increases; thus, PMWA members continued to be better paid than UMWA members.

The new PMWA-CPAI contract, entered into on April 6, 1978, included pay raises retroactive to March 27, the date of the new UMWA-BCOA contract. Eugene Hughes, PMWA district and international president, testified that these raises and their effective dates were negotiated and that PMWA "always" negotiated for raises retroactive to the date UMWA received raises. One Sahara employee testified that he received his first pay increase in his April 20, 1978, paycheck. Attorney Horsley, counsel for claimants, stated: "That would be correct, a ten day hold back." Horsley also stated that these raises were negotiated during negotiations resulting in the April 6 contract. "There was nothing automatic about it." During the hearing, the Director's representative expressly invited the parties to supply more evidence tending to show whether the PMWA raises were negotiated or were received as of right.

The Director's representative held that claimants were "directly interested" in the UMWA-BCOA dispute. In so concluding, the Director's representative expressly rejected claimants' contention that the pay raises provided for in the new PMWA-CPAI contract were negotiated. "[T]he claimants were entitled to the raise retroactively as a matter of right—and an enforceable right, at that. This then, was not a question of the employer's largess or the union's bargaining skills. It was, rather, an enforceable right ***."

In considering the dispute under the Administrative Review Act, the circuit court determined that claimants were not "directly inter-

ested" in the dispute, in that "the words 'directly interested' were not meant to exclude those members of another union who had not given any approval or consent to the strike by action of its membership or any of its officers."

Our standard of review is as follows: The findings and conclusions of the administrative agency on questions of fact shall be held to be "prima facie" true and correct. (Ill. Rev. Stat. 1979, ch. 110, par. 274.) We are not bound to give the same deference to an administrative agency's construction of a statute that we give to its findings of fact. While we might affirm a factual conclusion as not against the manifest weight of the evidence although we would have reached the opposite conclusion, we cannot let stand a decision based upon an erroneous construction of a statute. (*Nestle Co. v. Johnson* (1979), 68 Ill. App. 3d 17, 20, 385 N.E.2d 793, 795.) We are not bound by the administrative agency's characterization of a particular conclusion as one of fact. See *Berry v. Blackard Construction Co.* (1973), 13 Ill. App. 3d 768, 772, 300 N.E.2d 627, 630.

■ The Director's representative's "finding of fact" that claimants were "directly interested" in the dispute was actually a construction of section 604 of the Act; accordingly, we need not defer to that conclusion as we would to a finding of fact. Further, while the representative's conclusion that claimants' pay increases were not negotiated is not listed among the representative's formal findings of fact, it is nonetheless a finding of fact made by him and we treat it accordingly.

■ Sahara argues on appeal that the circuit court erred in concluding that "direct interest" required some element of participation in the strike by claimants or their union. We agree with Sahara's interpretation of that court's remarks, as well as with Sahara's contention that "direct interest" can lie without "participation." A statute should be construed, if possible, so that no word, clause, or sentence is rendered meaningless or superfluous. (*City of East Peoria v. Group Five Development Co.* (1981), 87 Ill. 2d 42, 47, 429 N.E.2d 492, 494.) Section 604 requires that a claimant, to avoid ineligibility, establish both lack of "participation" and lack of "direct interest." A claimant may establish lack of "participation" by showing that his failure to work is due to reasonable fear of violence. (See, *e.g., Sangamo Electric Co. v. Donnelly* (1962), 26 Ill. 2d 348, 357, 186 N.E.2d 230, 235; *Shell Oil Co. v. Cummins* (1955), 7 Ill. 2d 329, 338-39, 131 N.E.2d 64, 69.) However, we know of no cases in which fear of violence has been considered relevant with respect to "direct interest." We believe a claimant could be totally unable to work due to fear of violence, yet

"directly interested" in the dispute and hence ineligible from receiving benefits under section 604. *Cf. Local No. 658, Boot & Shoe Workers Union v. Brown Shoe Co.* (1949), 403 Ill. 484, 490, 87 N.E.2d 625, 629.

In the case at bar, Sahara and the Department of Labor do not argue that claimants "participated" in the UMWA-BCOA dispute. Instead, they contend that claimants were "directly interested" in that dispute because claimants acquired their pay increases as a matter of right under the "most favored nations" clause.

■ A mere expectancy without any legal right does not disqualify a claimant from receiving benefits under section 604. (*General Motors Corp. v. Bowling* (1981), 85 Ill. 2d 539, 543, 426 N.E.2d 1210, 1212.) A claimant's legal right to benefits obtained by employees actually engaged in the labor dispute is sufficient to create a "direct interest" in that dispute. (*Cf. Shell Oil Co. v. Cummins* (1955), 7 Ill. 2d 329, 131 N.E.2d 64.) In *Shell Oil Co. v. Cummins*, members of two unions struck, securing a wage increase which by "policy" of the employer was extended to the nonstriking unions' members as well. Such increases were held not to be a right of the nonstriking unions' members; therefore, they were held not to be "directly interested" in that dispute. We conclude that the Director's representative correctly identified the crucial issue as being whether claimants were entitled to their pay increases as a matter of right.

We must next inquire whether the representative's finding that those increases were acquired as of right was contrary to the manifest weight of the evidence. (*Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469, 471, 269 N.E.2d 713, 714, *cert. denied* (1971), 403 U.S. 918, 29 L. Ed. 2d 695, 91 S. Ct. 2229.) Sahara and the Department rely primarily upon the "most favored nations" clause as establishing that right; claimants do not ask this court to adopt a contrary construction of that clause. We note as well that claimants received their pay increase effective the same day UMWA members received their pay increase in the same amount. True, according to one claimant's uncontradicted testimony, claimants did not receive their increase until April 20, 1978, *i.e.*, during the new PMWA-CPAI contract; however, this does not establish conclusively, or presumptively, that that increase was not obtained as a matter of right. Assuming that claimants had the right to any increase prior to the negotiations resulting in the new contract, the union conceivably could have bargained that right away in exchange for other concessions; however, the fact that such right existed would not be affected by the possibility or the eventuality that it might be bargained away. In this regard, the existence

of the right would benefit the party possessing it by strengthening its bargaining position.

Claimants emphasize various uncontradicted evidence as showing that they worked whenever they could and that fear of violence was the primary motivation for their failure to work. As we have noted, that evidence is relevant to "participation" rather than "direct interest." It has no bearing on the question of whether claimants' pay increase was acquired as a matter of right. Claimants also urge that any rights they received under the "most favored nations" clause were relatively insignificant because their contract was about to expire. We do not read section 604 as permitting a distinction based on the monetary amount of claimants' interest. That a relatively small amount of salary may have been involved is not pertinent to the inquiry whether claimants were entitled to an increase in salary as a matter of right. Claimants also urge that they were paid more than UMWA members, under both the old and new contracts of the respective unions. However, according to Walter Lucas' uncontradicted testimony, both unions received the same salary increase. Thus, both received the same "benefits" (quoting from the "most favored nations" clause). For the same reason, testimony that PMWA members and UMWA members did not enjoy the same fringe benefits is not significant to our inquiry because there was no evidence of any significant new fringe benefits obtained by UMWA members during the UMWA-BCOA dispute.

We also note PMWA president Hughes' testimony that the pay increases were negotiated. We believe the Director's representative was free to disregard that testimony in view of its conclusory nature and the contradictory evidence of record. For the same reason, Walter Lucas' testimony that claimants were not "directly interested" in the UMWA-BCOA dispute is of no legal consequence; Lucas was an occurrence witness, and his opinion of the legal significance of the events he described does not bind the Director's representative or the courts.

■ We conclude that the Director's representative's finding that claimants' pay increase was achieved as a matter of right rather than by negotiation was based on evidence of record and that that determination was not contrary to the manifest weight of the evidence. The circuit court erred in reversing the Director of Labor's determination that claimants were "directly interested" in the UMWA-BCOA dispute.

We feel compelled to comment further upon the evidence that claimants were prevented from working by fear of violence. It seems a harsh rule of law which denies unemployment insurance benefits to

a claimant who chooses not to work rather than to risk his safety and that of his family. However, unemployment insurance is a creation of the legislature, which has seen fit to set three conditions to its availability, all of which a claimant must meet. Without question the legislature is empowered to make proof of lack of "participation"—or, more directly, reasonable fear of violence—sufficient to avoid ineligibility. This the legislature has not done. If section 604 should be changed, it is for the legislature to change it, not this court.

For the foregoing reasons, the judgment of the circuit court of Saline County holding claimants eligible for unemployment insurance benefits under section 604 of the Act for the period of time in question is reversed.

Reversed.

JONES, J., concurs.

JUSTICE HARRISON, dissenting:
I respectfully dissent.

Our supreme court, in *Outboard, Marine & Manufacturing Co. v. Gordon* (1949), 403 Ill. 523, 87 N.E.2d 610, determined the legislative intent underlying section 604 of the Unemployment Compensation Act and established the guidelines to determine ineligibility thereunder when it stated:

> "The conclusion is unescapable that the legislature intended to provide for the innocent victims of a labor dispute by specifically excluding them from the denial of unemployment compensation. The previously quoted subsection *** was meant to protect and except such victims from the classes denied compensation by its terms. Those who were to be excluded from benefits by the statute were those who attempted to gain by conduct which caused their unemployment or those who actively aided or abetted the previous group, whether or not they gained or lost. A proximity of conduct aiding or abetting the strikers or *proximity of result* to be gained from the dispute were meant to be the measuring factors. The legislature did not intend to bar, because of *remote claims of* causation or *result*, those who were deprived of their employment from the benefits to be received under the act." (Emphasis added.) *Outboard, Marine & Manufacturing Co. v. Gordon* (1949), 403 Ill. 523, 536-37.

Applying the "proximity of result to be gained from the dispute"

as a measuring factor to the facts in the case *sub judice,* I feel the trial court's decision that the plaintiffs did not have a "direct interest" in the labor dispute of the United Mine Workers of America against the Bituminous Coal Operators Association was correct.

First, the plaintiffs' position that they had no direct interest in the United Mine Workers of America labor dispute is substantiated by the fact that Progressive Mine Workers of America members were already receiving more pay than the members of the United Mine Workers of America at the time of the commencement of the strike. As of November 12, 1977, a $2 a day increase for each employee of Sahara Coal Company went into effect. This increase had been negotiated and provided for in the contract, commencing April 10, 1975.

Second, the brief period of time remaining on the term of the collective bargaining agreement between Progressive Mine Workers of America and the Coal Producers Association of Illinois also limits the proximity of the result to be gained by plaintiffs as a consequence of the labor dispute. The work stoppage commenced in December of 1977 and the contract of the Progressive Mine Workers of America, including plaintiffs herein, was due to expire on April 9, 1978. This four-month period of time would limit the results to be gained by plaintiffs as a result of the United Mine Workers of America labor dispute in that if a more favorable or less favorable contract concerning wages or working conditions was received by the United Mine Workers of America, there would hardly be time to modify the existing agreement between the Progressive Mine Workers of America and the Coal Producers Association of Illinois prior to the expiration of the existing collective bargaining agreement.

Third, it is important to note that plaintiffs, as members of the Progressive Mine Workers of America, returned to work at the Sahara facilities, not at the termination of the strike of the United Mine Workers of America against the Bituminous Coal Operators Association, but on March 7, 1978, at the time that President Carter issued a Taft-Hartley injunction. The strike of the United Mine Workers of America was not settled until March 27, 1978. Plaintiffs' return to work on March 7, 1978, is a further fact demonstrating that they had no interest in the results of the strike and labor dispute of the United Mine Workers of America, particularly in light of the fact that the contract of the Progressive Mine Workers of America with the Coal Producers Association of Illinois was due to expire on April 9, 1978.

Further, as was stated in plaintiffs' brief and reflected in the record, Walter Lucas, vice-president of Sahara Coal Company, testified that plaintiffs were not financing or directly interested in the work

stoppage of the United Mine Workers of America and were not involved in a labor dispute with Sahara. Thus, plaintiffs were not "directly interested in the labor dispute which caused the stoppage of work." They failed to cross the picket line *only* because they were intimidated by threats of violence. This was testified to by the plaintiffs and is seemingly acknowledged by the majority in its opinion.

Finally, it appears to me that there was not a "labor dispute at the *** establishment or other premises at which he or she was last employed," as required by section 604. The majority stated that it would not consider this argument because the parties did not rely on this point on appeal. However, the plaintiffs stated in their brief:

> "Lucas admitted that none of the people listed in the PMW Contract with Sahara were financing or directly interested in the work stoppage of the United Mine Workers and that there was no dispute between those people and Sahara at that time. (Volume 2, p.31.) As far as Lucas knew, there was no labor dispute with the Company at that time.[1]
>
> [1]This is particularly significant as Section 604 of the Unemployment Compensation Act (Ch. 48, §434, Ill. Rev. Stat.) bases ineligibility for benefits on three factors including that proximate causation must be found between the work stoppage and the labor dispute at Claimant's factory, establishment, or other premises."

Thus, I think the point has been sufficiently raised. Also, a reviewing court may *affirm* a judgment of a trial court for reasons other than those advanced by the trial court. *Well v. Schoeneweis* (1981), 101 Ill. App. 3d 254, 258, 427 N.E.2d 1343.

There was clearly no dispute of any kind between plaintiff employees and Sahara. On the contrary, the labor dispute was between other companies and workers at other premises. Section 604 bases ineligibility on three factors: the presence of (1) a work stoppage, (2) a labor dispute, and (3) proximate causation between the work stoppage and the labor dispute at the claimant's factory, establishment or place of employment. The presence of a labor dispute at other premises is of no legal significance. See *Central Foundry Division v. Holland* (1976), 36 Ill. App. 3d 998, 345 N.E.2d 143.

Therefore, I feel the trial judge was correct in reversing the decision of Director of Labor and finding plaintiffs were eligible for unemployment insurance. I would affirm the judgment of the circuit court of Saline County.